**RECONSTRUCTION FINANCE CORP. v. KAPLAN et al.**

**In re WALTHAM WATCH CO.**

No. 4523.

United States Court of Appeals First Circuit.

Dec. 21, 1950.

Rehearing Denied Jan. 8, 1951.

See also D.C., 92 F.Supp. 871.

792

Charles C. Cabot and Harry Bergson, Boston, Mass. (Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., on brief), for appellant.

Jacob J. Kaplan, Boston, Mass. (Daniel J. Lyne and C. Keefe Hurley, Boston, Mass., on brief), for trustees, appearing pro se, appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and FAHY, Circuit Judges.

MAGRUDER, Chief Judge.

There is pending in the court below a debtor's petition for reorganization under Chapter X of the Bankruptcy Act, as amended, 52 Stat. 883, 11 U.S.C.A. § 501 et seq. The present appeal is by Reconstruction Finance Corporation, a secured creditor, from an order of the district court on a petition for authorization to the reorganization trustees to conduct the business of the debtor.

Waltham Watch Company, the debtor, is a Massachusetts corporation engaged in the business of manufacturing and selling jeweled watches, parts, and other timing instruments. It is an old and established concern, of considerable local importance. The company was in an earlier reorganization pursuant to a debtor's petition under Chapter X filed in the court below on December 28, 1948. A plan of reorganization thereunder was confirmed by the court on June 10, 1949, and consummated on September 23, 1949. As part of the plan, the debtor received from RFC a loan in the sum of $4,000,000, subject to security provisions which gave to this creditor pretty much of a strangle-hold on the life of the company. Thus, the debtor executed (1) a real estate mortgage covering all the real estate and plant of the company, (2) a chattel mortgage covering all of its machinery and equipment, (3) a factor's lien agreement covering all its merchandise inventory and its accounts receivable arising from the sale of said inventory, such agreement conforming to the provisions of C. 255, Mass.G.L.(Ter.Ed.), as amended by C. 273, Laws of Mass. 1947, and (4) an assignment of all notes and accounts receivable and trade acceptances owned by the debtor on September 21, 1949, or thereafter acquired.

By the terms of the factor's lien agreement the debtor was permitted until default to sell its merchandise in the usual course of business. The RFC under the powers conferred collected the accounts receivable and placed the same in a so-called cash collateral account, from which it doled out or "reloaned" to the debtor from time to time certain sums as working cash.

In October, 1949, the debtor applied to RFC for an additional loan of $3,000,000, stating in its application that operating losses for 1950 were anticipated to be in excess of $1,000,000, and that without this further loan the company could not continue in business. The loan was not forthcoming, though notification of RFC's refusal was not made until February 3, 1950, on which day the debtor shut down.

Meanwhile, on January 23, 1950, Waltham Watch Company failed to pay an installment of interest in the sum of $13,333.33 on the note to RFC, and also failed to make a monthly tax deposit of $2,700 pursuant to the loan agreement. At this date RFC held in the cash collateral account the sum of $347,103.69. However, on February 3, 1950, it declared the loan in default and the entire indebtedness immediately due and payable, and took possession of all the debtor's plant, machinery, fixtures, equipment, inventory, materials and supplies. As above stated, RFC was already in possession of the cash proceeds arising from the collection of the debtor's accounts and notes receivable.

Later on the same day, February 3, 1950, Waltham Watch Company filed in the court below the petition now pending for reorganization under Chapter X. On February 28, 1950, the district court entered an order approving the petition as properly filed, permitting RFC to continue in possession of the debtor's property for the time

being, and appointing three disinterested trustees of the debtor.

A plan of reorganization was filed by the trustees on May 15, 1950, and an amendment thereto on June 12, 1950. The plan came on for hearing on June 20, 1950, and on June 30 the district court filed a memorandum stating: "I find the Trustee's plan to be fair, equitable, and feasible, and give it the Court's approval." It does not appear that this approval has yet been embodied in a formal order, nor does it appear what further steps have been taken toward confirmation and consummation of the plan. The detailed provisions of the plan need not be examined in the present appeal.

■ Also on June 20, 1950, the district court held a hearing on a petition, by the debtor and the voting trustee of all the common stock of the debtor, seeking interim authority in the trustees to take possession of the debtor's property and to operate the business, "with special reference to the completion of the unfinished movements now on hand, the dialing and preparation for sale of the finished movements and the inspection, testing and further preparation for sale of the completed watches now in the possession of the Debtor". On July 10, 1950, the court made its findings of fact and order granting this petition. The evidence produced at the hearing has not been included in the appellate record, and the findings of fact of the district court must be accepted by us. The court's findings are as follows:

"The Debtor is solvent. While the amount by which the value of its assets fairly exceeds its liabilities cannot be determined with precision, it is abundantly clear that:

"(a) The value of these assets exceeds by a substantial amount the Debtor's secured indebtedness to the Reconstruction Finance Corporation (hereinafter called RFC) and the unsecured indebtedness of the Debtor.

"(b) The greater part of the assets consists of watches and watch movements. These assets are of a wasting and seasonal character in that,

"(1) continued retention of the watches and watch movements at the factory without the application of labor to oiling, testing and conditioning will probably result in deterioration of this inventory in quality and value, and would require the expenditure of a greater amount of labor in necessary conditioning of this inventory before sale at a future date than would otherwise be necessary.

"(2) The debtor's inventory contains approximately 76,000 watch movements for which an equal number of watch cases are owned by the debtor. These as watch movements are worth in the neighborhood of $8.00 each. The watch cases as such have little value. By the expenditure of approximately $3.50 per movement, the movement can be conditioned, placed in a case, necessary attachments affixed, and the completed watch boxed. In such completed state the watch will have a value of from $18.00 to $23.00 according to the manner of selling the watches. Thus by the expenditure of about $260,000 in the aggregate, the value of the inventory of watch movements and related cases will be increased by about $760,000.00 or a net increase of $500,000.

"(3) The sale of watches is highly seasonal. About two-thirds of the total sales of a watch factory are made in the fall and winter months for sale to the ultimate consumer during the Christmas season. In order that sales may be made for this Christmas season it is essential that the Debtor's inventory be promptly conditioned, cased and marketed almost immediately. Otherwise the 1950 Christmas market will be missed, and there will be no substantial sales until early in 1951 when sales begin for the lesser Easter season which normally accounts for about one-third of a watch manufacturer's volume. If the Debtor's plant remains idle pending consummation of the plan of reorganization which has been approved, heavy overhead charges will be incurred, for which there will be no compensation, and net equity of the unsecured creditors and stockholders will be sharply diminished.

"(c) The order entered herewith can be carried out without impairing the position or security of RFC. On the contrary that

position and security will be substantially improved."

Following is the order of July 10, 1950, from which the present appeal was taken:

"1. The Trustees are authorized from time to time to take possession of and operate all the property, assets and plant of the Debtor including that mortgaged to RFC and upon which it has a lien or liens, including without restricting the preceding generality, inventory, supplies, cash, securities, accounts receivable, plant, machinery and equipment; to conduct the business of the Debtor and to sell from time to time portions of the inventory at such prices and upon such terms as the Trustees deem prudent; and for such purpose to purchase for cash or on credit and use necessary materials, supplies and other assets and to employ operatives and other necessary assistance.

"2. The net proceeds of sales of the Debtor's inventory by the Trustees shall be kept in a separate account, and shall be applied solely to the expense of operating the Debtor's business as hereinbefore specified. Subject to the further orders of the Court, which may hereafter prove necessary to carry out the intent hereof, the RFC's lien shall be transferred to the said net proceeds.

"3. The Trustees are authorized to employ Teviah Sachs to direct the operations of the Debtor's business at the discretion and subject to the control of the Trustees, and to pay him compensation for such services at the rate of $25,000 per year.

"4. If the Trustees hereafter from time to time deem it necessary that they borrow funds and issue Trustees certificates herefor for the purpose of conducting the Debtor's business, they may apply to the Court for leave to do so upon five days prior notice in writing to RFC; and the Court reserves the right to authorize borrowing upon such certificates upon such terms and with such priority as the Court shall upon such hearing determine.

"5. RFC is herewith directed as and when requested in writing so to do by the Trustees to deliver to them for the purposes and in accordance with this order any and all property of the Debtor which is now or may hereafter be in the possession of RFC.

"6. All persons are herewith enjoined from interfering in any manner with the possession by the Trustees of the Debtor's property or the carrying on by the Trustees of the business of the Debtor in accordance with this order."

On August 7, 1950, an application for a stay of this order pending appeal was denied by order of this court.

The chief point raised by appellant is as to the power of the district court to order the turnover to its reorganization trustees of the debtor's merchandise inventory held in the possession of RFC as pledgee under the factor's lien agreement.

██ In contrast with the provisions of law relating to straight bankruptcy, Chapter X, like its earlier counterpart § 77B, 48 Stat. 912, 11 U.S.C.A. § 207, contemplates the rehabilitation of financially ailing business corporations under plans of reorganization which may deal with claims of creditors, secured as well as unsecured, and embrace all of the debtor's property, however encumbered with outstanding security interests. In keeping with this objective, appropriate broad powers are conferred upon the reorganization court. Section 111 provides that for the purposes of Chapter X the reorganization court shall "have exclusive jurisdiction of the debtor and its property, wherever located." Section 115 provides that, upon approval of a petition for reorganization, the court may, in addition to the powers elsewhere conferred upon it, "exercise all the powers, not inconsistent with the provisions of this chapter, which a court of the United States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or inability to meet its debts as they mature." Sections 256 and 257 read as follows:

"§ 256. A petition may be filed under this chapter notwithstanding the pendency of a prior mortgage foreclosure, equity, or other proceeding in a court of the United States or of any State in which a receiver or trustee of all or any part of the proper-

ty of a debtor has been appointed or for whose appointment an application has been made.

"§ 257. The trustee appointed under this chapter, upon his qualification, or if a debtor is continued in possession, the debtor, shall become vested with the rights, if any, of such prior receiver or trustee in such property and with the right to the immediate possession thereof. The trustee or debtor in possession shall also have the right to immediate possession of all property of the debtor in the possession of a trustee under a trust deed or a mortgagee under a mortgage."

Section 256 and the first sentence of § 257 obviate for purposes of Chapter X the restrictive interpretation of old § 77B in Duparquet Huot & Moneuse Co. v. Evans, 1936, 297 U.S. 216, 56 S.Ct. 412, 80 L.Ed. 591. See In re Franklin Garden Apartments, Inc., 2 Cir., 1941, 124 F.2d 451, 453-454. The second sentence of § 257 may not specifically authorize a turnover order displacing the ordinary possessory lien of a pledgee of collateral or other personal property; but it seems in substance to cover the kind of security interest which RFC had in the inventory under its statutory factor's lien. In other words, RFC's lien on the inventory had the characteristic of a chattel mortgage, with possession, and the right to possession, remaining in the borrower until default. But there is no need to rest on the second sentence of § 257, which is not the broad basic section conferring upon the court jurisdiction over all the debtor's property wherever located; it appears rather to be a specific provision inserted out of abundance of caution to make clear the inapplicability under Chapter X of Tuttle v. Harris, 1936, 297 U.S. 225, 56 S.Ct. 416, 80 L.Ed. 654, a case decided under § 77B.

■ Bearing in mind the objective of Chapter X proceedings, there is no *a priori* reason for supposing that Congress, in defining the powers of the reorganization court, would give a preferred status to secured creditors having possession of pledged collateral or other personal property, as against secured creditors who have taken possession under a defaulted real estate or chattel mortgage. See 6 Collier, Bankruptcy (14th ed.) § 14.03(2). The authorities, though we have found none precisely on all fours, seem to indicate that no such distinction is taken. In Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 1935, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, which arose under § 77, 47 Stat. 1474, 11 U.S.C.A. § 205, dealing with railroad reorganizations, the Supreme Court affirmed an injunction which had been issued by the district court, forbidding secured creditors to sell or otherwise dispose of collateral securities held by them on pledge pending confirmation of a plan of reorganization, the purpose of the injunction being "to prevent the defeat or impairment of its jurisdiction", 294 U.S. at page 675, 55 S.Ct. at page 606. Authority for issuing the injunction was found in the general equity powers of the court as conferred in § 2, 11 U.S.C.A. § 11, and in the "all writs" section of the Judicial Code, now 28 U.S.C.A. § 1651. Section 77(a), like § 111 of Chapter X, vests in the reorganization court "exclusive jurisdiction of the debtor and its property wherever located". Under this broad language, the Supreme Court declined to recognize any distinction between the power of the court to control pledged collateral of the debtor and property subject to mortgage. "So far as constitutional power is concerned, there is no difference between an injunction restraining the enforcement of a real estate mortgage and one restraining the enforcement of a pledge by the sale of collateral security. Such differences as exist affect not the power but the propriety of its exercise—that is to say, the discretion of the court." 294 U.S. at page 677, 55 S.Ct. at page 606. It is true that in the Rock Island case, the Court merely issued an injunction and did not direct that the pledged collateral be turned over to the reorganization trustee. But this, we think, was not from lack of power in the Court to supplant the possession of a secured creditor, if, in its sound discretion, it deemed that possession by the trustee would best serve the purposes of the re-

organization proceeding. The power to displace a mortgagee in possession is undoubted. This result was reached in Grand Boulevard Inv. Co. v. Strauss, 8 Cir., 1935, 78 F.2d 180, under the broad grant of jurisdiction in § 77B, without the aid of any specific provision such as is now found in the second sentence of § 257 of Chapter X. See also Dalton v. Peters, 8 Cir., 1941, 119 F.2d 494. There could be no constitutional difficulty with a similar displacement of a pledgee in possession. While the court, pending the working out of a reorganization, may interfere with and postpone the secured creditor's remedy, it must be careful not to impair his substantive rights. That is the way it is expressed in the books, though we would not overplay the distinction between rights and remedies. No doubt the secured creditors in the Rock Island case felt that their "rights" had been impaired when they were forbidden to get clear of the transaction by exercising their contractual power of sale of the pledged collateral at a time which seemed to them most favorable to their interests. For the time being the secured creditors had to content themselves with getting out of the driver's seat.

The Rock Island case was followed In re Prudence-Bonds Corp., 2 Cir., 1935, 77 F.2d 328, a reorganization proceeding under § 77B, in which the district court was upheld in enjoining the foreclosure of mortgage securities pledged as collateral for notes of the debtor. The court emphasized the extensive grant of jurisdiction which had been given the reorganization court under § 77B, as compared with the powers of the court in a straight bankruptcy proceeding. After pointing out that while a reorganization is proposed or pending, the collateral in the possession of the indenture trustees, including cash representing receipts derived from such collateral, "is *in custodia legis,* with full power in the court, in its administration of the estate of the debtor pending reorganization, to control and direct the administration of this collateral", the court continued, 77 F.2d at page 330: "Prior to the enactment of section 77B, the property of a bankrupt was not considered as being in the custody of the bankruptcy court unless, at the time the petition was filed, it was in the actual or constructive possession of the bankrupt. * * * Section 77B has amended the Bankruptcy Law so that now, by subdivision (a), if the petition or answer is approved, the court 'shall, during the pendency of the proceedings under this section, have exclusive jurisdiction of the debtor and its property wherever located for the purposes of this section.' 11 U.S.C.A. § 207(a). Formerly, the court, while having jurisdiction of whatever equity a bankrupt might own in pledged property, did not have jurisdiction over the property itself. The property was in the possession of the pledgee, and the bankrupt having neither real nor constructive possession thereof, the bankruptcy court had no jurisdiction over it. Taubel, etc., Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770. But the present grant of jurisdiction, under section 77B, contains no limitation which excludes property subject to a lien or mortgage.

"Subdivision (b) (1) of section 77B of the act, 11 U.S.C.A. § 207(b) (1), provides that a plan of reorganization shall include provisions modifying the rights of creditors generally whether secured or unsecured. The former bankruptcy act and section 77B differ fundamentally in the purposes sought to be accomplished. The former provided for liquidation, while the latter seeks a reorganization by means of rehabilitation Rehabilitation of a debtor demands that the court have possession of all the property of the debtor, no matter what may be nature of the debtor's possession, or whether the debts are secured or unsecured."

In re Moulding-Brownell Corp., 7 Cir., 1939, 101 F.2d 664, has a close bearing on the case at bar. There the debtor had pledged and assigned accounts receivable to a creditor as security for a loan. After a petition had been filed and approved under § 77B, the court in a summary proceeding, though the loan was in default, ordered the reorganization trustees to take over the collection of the accounts receivable, to deduct a percentage thereof as a fee for collection, and to retain the balance in a separate account to await the further order of the court. The order was affirmed on

appeal, on the authority of the Rock Island case. Another case illustrating the wide power of the reorganization court is In re Philadelphia & Reading Coal & Iron Co., 3 Cir., 1941, 117 F.2d 976. In that case the debtor had given a mortgage covering substantially all of its properties to secure an issue of refunding bonds. Included in the property of the debtor covered by the mortgage were certain shares of corporate stock and corporate bonds owned by the debtor, which the debtor had pledged under mortgage provisions entitling the debtor to receive all dividends and interest paid thereon prior to default. The debtor filed a petition for reorganization under § 77B. The reorganization court denied a petition by the mortgage trustee for an order directing the debtor to pay over to it the amount of dividends and interest theretofore collected by the debtor and any future dividends and interest received on the pledged stocks and bonds. This order of denial was affirmed on appeal. At page 978 of 117 F.2d the court said: "We do not think that any distinction of legal significance may be drawn between the right of a pledgee to recapture this income upon default and the similar right reserved by a mortgagee. Both must yield to the necessity of preserving intact the business and property of the debtor to the extent reasonably necessary to afford an opportunity for reorganization. Otherwise the effective administration of Section 77B (and its successor Chapter X, 11 U.S.C.A. § 501 et seq.) might depend upon whether the principal assets of a corporation seeking reorganization consisted of real or personal property."

Fidelity-Philadelphia Trust Co. v. Weaver, 3 Cir., 1938, 98 F.2d 471, is not authority for the proposition that a debtor in reorganization under § 77B could not recover pledged stock and cash in the hands of a secured creditor. See the report of the case on the first hearing, *sub nom.* In re Pennsylvania Central Brewing Co., 3 Cir., 93 F.2d 1012, referring to the proceedings in the district court, 18 F.Supp. 458. From the opinion of the district court it appears that the attempted reorganization under § 77B had failed because the consent of the owners of two thirds of the outstanding bonds could not be obtained, and that the court had ordered the company liquidated.

Having satisfied ourselves of the power of the court below to deal with the pledged merchandise inventory in the hands of the secured creditor, in which personal property the debtor retains a substantial equity, we perceive no abuse of discretion in the terms of the turnover order, in view of the district court's findings of fact. Pending the outcome of the reorganization proceedings, the preparation for market of the deteriorating inventory, and the sale thereof, would seem to be a prudent act of management, likely to improve the chances of success of whatever plan of reorganization is eventually confirmed. If the operations of the debtor were allowed to come to a standstill, and the debtor's product should remain off the market for a substantial period of time pending reorganization, the good will of the business would be likely to be impaired, and the company would be likely to suffer the loss of much of its trained employee-personnel. Interim operation such as is contemplated in the order of July 10, 1950, is authorized by § 116(3) and § 189. The security interest of RFC in the inventory is safeguarded, indeed will be enhanced in value, by the transfer of its lien to the net proceeds of the sales, as provided in paragraph 2 of the order. Appellant claims that this is illusory, in that the authorization "is broad enough to justify the Trustees, not only in using the proceeds of the sales of inventory as working capital for the ordinary operation of Waltham, but also in using those proceeds for such matters as promotional schemes, advertising, extensive repairs or even new building construction." The trustees disclaim any such broad interpretation of the order, and state that according to their understanding the order authorizes them to use the proceeds of the sales of inventory solely for the purpose of paying expenses of the processing and sale of such inventory, the net proceeds otherwise to be kept in a separate account subject to RFC's lien. In affirming the order, we accept this interpretation of it by the trustees.

Of course RFC has a legitimate interest in being kept informed of the steps taken

by the trustees in the disposition of the inventory. It might have been better if the order had specifically directed the trustees to make reports to the court from time to time of the specific steps taken, in order that the secured creditor might have an opportunity of challenging any action with reference to the inventory which it deemed unduly prejudicial to its security interests. However, the order is not challenged on this narrow ground. At the argument on appeal, counsel for the trustees stated that RFC has in fact been kept informed of the steps which were being taken to dispose of the inventory, and it has not been suggested by appellant that the trustees have in any way acted improvidently in this respect. We have no doubt that if in the future RFC should have need of further information along this line, the district court upon application will see that it is forthcoming.

Paragraph 5 of the order directs RFC, when requested by the trustees, "to deliver to them for the purposes and in accordance with this order any and all property of the Debtor which is now or may hereafter be in the possession of RFC." This would include any moneys of the debtor held by RFC as collateral security. Since the value of the debtor's assets "exceeds by a substantial amount" the debtor's secured and unsecured indebtedness, and since RFC has a lien on all the property of the debtor, it follows that the debtor's equity, applied distributively, extends to every item of its property, including any cash held as collateral security. The trustees interpret the court's order as not authorizing the use of the cash as working capital for a general business, but as merely permitting the trustees to use the same as a revolving fund to condition and sell the inventory. The lien of RFC is to be transferred to the net proceeds from the sale of the inventory, thus enhanced in value by this use of the cash. From the findings of fact it appears that the net security position of RFC will be strengthened rather than impaired by the operation. Appellant contends that the proper way to finance interim operations of businesses in reorganization is by making use of § 116(2) of the Act, which empowers the court to authorize the issuance of trustee's certificates "with such security and priority in payment over existing obligations, secured or unsecured, as in the particular case may be equitable". On this suggestion, the trustees in their brief properly make the comment: "Just how RFC's position would have been improved, had it been ordered that cash be obtained by the issue of Trustee's certificates of indebtedness having priority over RFC, it is difficult to determine."

We think cash held as collateral may be dealt with by the reorganization court as any other form of collateral. We do not know of any case in which such cash collateral has actually been ordered turned over to the reorganization trustee over the objection of the creditor, but the power to order such turnover may be inferred from the numerous cases in which the court ordered the reorganization trustee to collect rents and profits from mortgaged realty, or dividends and interest from pledged stocks and bonds, all in derogation of the strict letter of the contract between the debtor and creditor. See In re Moulding-Brownell Corp., supra, 7 Cir., 101 F.2d 664; In re Prudence-Bonds Corp., supra, 77 F.2d 328; In re Philadelphia & Reading Coal & Iron Co., supra, 3 Cir., 117 F.2d 976; John Hancock Mutual Life Ins. Co. v. Casey, 1 Cir., 1943, 139 F.2d 207. See also In re Franklin Garden Apartments, Inc., 2 Cir., 1941, 124 F.2d 451.

In our foregoing comments on the power of the reorganization court to deal with moneys of the debtor held as collateral security, we do not mean to prejudge the status of the cash held by RFC in the so-called cash collateral account mentioned earlier in this opinion. We understand the claim of RFC to be that this cash belongs outright to it and is not in any sense "property of the Debtor" within the meaning of paragraph 5 of the order of the district court now under review. This issue is not now before us for determination.

The judgment of the District Court is affirmed.