## In re WALTHAM WATCH CO.

No. 121–50.

United States District Court
D. Massachusetts.

May 1, 1951.

See also 95 F.Supp. 229.

Harry Bergson, Sr., and Charles C. Cabot, Boston, Mass., for the Reconstruction Finance Corporation.

Jacob J. Kaplan, Daniel J. Lyne, and C. Keefe Hurley, all of Boston, Mass., Trustees, pro se.

SWEENEY, Chief Judge.

I have today directed the entry of an order finding the Trustees' amended Plan of Reorganization dated as of April 16, 1951, fair, equitable and feasible and directing that it be submitted to the parties

in interest herein for obtaining the consents required under Chapter X.

A brief narrative of the course of the proceedings herein is desirable, and is indeed almost necessary, in order that creditors and voting trust certificate holders may have the facts before them in casting their ballots.

The business conducted by Waltham Watch Company, the Debtor, was founded in 1850. It was among the pioneers in the development of mass production of jeweled watches, and for many years was among the leaders in the industry. Persons trained in its factory have gone on to develop similar enterprises in this country, and many of the founders of the modern Swiss watchmaking business obtained their skills by working in the Debtor's plant. Waltham watches have been well and favorably known for generations. During World War I and World War II the Debtor played an important part in manufacturing timing and precision mechanisms for this country and its allies. Its business is regarded by those charged with the duty of providing for the defense of the United States as being essential for that defense.

Accordingly when in the closing days of 1948 the Debtor decided to seek the aid of this court in order to effect a reorganization under the provisions of Chapter X of the Bankruptcy Act, this Court immediately approved the petition, and appointed three wholly disinterested persons as Trustees, in whose character, judgment and ability the Court had complete confidence.

It is not necessary to recite in detail the course of the 1948 proceedings, since we are here concerned with the reorganization of the Debtor under the second petition filed on February 3, 1950. It should, however, be noted that with a degree of diligence which has rarely been equaled in a matter of this kind, the Disinterested Trustees in the first reorganization proceeding completed all of the necessary steps so that a plan was proposed by them within a few months after their appointment, it received the necessary consents within five months and was confirmed by an order of this Court entered June 10, 1949, and consummated September 23, 1949. This reorganization accomplished the following principal results:

(1) The Trustees obtained a discount of $1,060,000 upon the claims of certain banks which held secured claims of $4,310,000 paying the banks $3,250,000 to extinguish their claims.

(2) There was a further reduction of about $4,000,000 in the Debtor's debt structure by the conversion of its debentures upon which approximately $4,000,000 of principal and interest was due into slightly less than 1,000,000 shares of $1 par value of common stock.

(3) Priority creditors were paid in full.

(4) Unsecured creditors received 50% of their claims in cash and the other 50% in stock at par. This stock has generally sold for more than par, and as of the date of this Opinion it is selling for about twice par.

(5) There was obtained from RFC a ten-year 4% loan which for all practical purposes was in the amount of $4,000,000. A further sum of $2,000,000 authorized and earmarked for the purchase of machinery was never loaned.

(6) After payment of the sums necessary to provide a reserve for the payment of creditors and bankruptcy expenses, the company had about $2,000,000 available to it as the net proceeds of the RFC loan.

(7) The Trustees obtained the services of Teviah Sachs, an experienced and competent person in the field of watch manufacture, as Vice President in charge of sales.

(8) The President and General Manager of the company was John J. Hagerty, who had been manager of the Boston Agency of RFC, and who the Trustees believed had the necessary qualities to head the reorganized company.

(9) The Trustees had engaged a leading firm of industrial engineers to survey the operations, management and prospects of the company.

It was clear therefore that, if competently managed, the company had a reasonable prospect of success. The Disinterested Trustees appointed by the Court ceased to

have anything to do with the operations of the company on September 23, 1949.

Unfortunately differences in internal management developed almost immediately after September 23, 1949. There also appears to have been a misunderstanding between the management of the company and RFC as a result of which the company based its policy and plans upon the expectation of getting a further loan of $3,000,000 from RFC which it believed RFC had agreed to grant. As a result, when on January 28, 1950, RFC informed the company that it would not make this further loan, the company found itself with a heavy inventory and no cash. The company therefore filed the second petition under Chapter X on February 3, 1950. This is the petition upon which the present proceedings are based.

When this petition was presented to me for approval on February 3, 1950, I hesitated about approving it, and withheld approval until I had had an opportunity to consider whether the differences between the Debtor and RFC could be resolved, and whether there was any reasonable prospect that the Debtor could be successfully reorganized. Among the circumstances which made me hesitate were the following:—All of the assets of the company of any consequence were subject to a lien to secure the RFC loan of $4,000,000. RFC was in fact in possession of all of these assets under a claim of default, as a result of which it had also declared the whole $4,000,000 loan immediately due. While the Debtor claimed that its assets were worth more than the amount due RFC, the latter claimed that they were not. The fact that the company was compelled to file a second petition for reorganization within approximately four months from the time that it had emerged from the first reorganization proceedings rendered the prospect of a second and successful reorganization more difficult.

The quoted prices of the company's stock reflected this doubt. During the closing days of 1949 the stock (represented by Voting Trust Certificates) was quoted at about 1⅛ on the New York Curb Exchange. During the week ending February 3, the week in which the petition was filed, it fell to ¼, i. e., 25 cents per share.

On February 28, 1950, I accepted the petition, thus affording the Debtor another opportunity to reorganize under Chapter X. I was led to that decision by the opinion that there was a chance, even though remote, that the company could be successfully reorganized; that the causes which had led to the breakdown after the first reorganization were not irremediable; that the company was an important economic factor in the City of Waltham; and above all that it was highly essential as a link in the national defense at a time when war clouds were gathering. On February 9, 1950, the Chairman of the War Munitions Board wrote a letter to RFC which reaffirmed the views of the Munitions Board as to the importance of the maintenance of the Waltham Watch Company as a link in the defense of this country. This letter reads as follows:—

"February 9, 1950
"Dear Mr. Hise:
The Munitions Board has heretofore expressed to you the position and importance of the American Jewelled watch industry as a resource for national defense. You were informed that there were approximately 8,000 highly skilled workers in the industry and that the acquiring of the degree of skill required from two to ten years of intensive training.

The essentiality of the maintenance of this nucleus as a basis for expansion in times of mobilization is apparent.

The Waltham, Hamilton and Elgin Watch Companies employed one hundred per cent of their capacity in Government work from December 1941 to August 1945 manufacturing such items as aircraft instruments, chronometers, fire control watches, time fuses, etc.

It is considered that the maintenance of at least a minimum level of operation by the Waltham, Hamilton and Elgin Watch Companies is vital to the defense of the United States and should be preserved.

The above information is provided again for your consideration of the application

of the Waltham Watch Company for financial assistance.

"Sincerely yours,
"Hubert E. Howard.
"Chairman"

All of the creditor and stockholder interests who appeared before me, as well as the representatives of the Debtor, urged that I reappoint the same three men who had been the Disinterested Trustees in the first reorganization. I believed them to be best qualified for the task. They were reluctant to reassume the burdens of the position, but in view of the public interest they consented to accept the appointment, and accordingly on February 28, 1950, I accepted the petition, and appointed the same three men as Disinterested Trustees. The Trustees immediately undertook to gather the material for the formulation of a plan of reorganization.

The most difficult and troublesome problem which the Trustees had immediately to deal with was the relation of RFC to the Debtor and any plans for its reorganization. RFC's net claim at this time was about $3,500,000 if credit were given to about $500,000 representing collections on the Debtor's receivables which RFC held in a collateral cash account. However, even reducing the debt to this figure of $3,500,000, RFC took the position that there was no value in the assets above its net claim which would be available for unsecured creditors or stockholders and that RFC ought to be permitted to foreclose its lien as soon as possible. Accordingly RFC closed the plant, discharged its approximately 1400 employees, and refused to resume manufacturing operations even to the limited extent of completing partly completed watches although repeatedly urged to do so.

Upon the matter of reorganization, RFC's position was that it would not assent to a reorganization which involved an extension of the maturity of its loan unless a substantial amount was put in for capital stock subordinate to its claim. This was later stated to be at least $2,000,000 in equity capital or a guarantee of $2,000,000 of the RFC loan.

In these circumstances the Trustees at my direction solicited proposals for plans. The Court adjourned the time for submission of these proposals on several occasions so that all possible plans might be presented and considered. It finally fixed June 21, 1950, as the last time for the receipt of any amendments to the proposals which had been filed.

On June 20, 1950, there had been a final hearing before me for the purpose of determining what plans for reorganization, if any, I should determine to be fair, equitable and feasible. The parties were allowed until the close of June 21, 1950, to file any amendments to their proposals. There were ultimately before me four proposals severally submitted by the following:

1. Frederic C. Dumaine, Sr., and F. C. Dumaine, Jr.

2. Allen B. Gellman and Norman B. Schreiber.

3. Bulova Watch Company.

4. The Stockholders.

These proposals, some of which had been amended from time to time, in their final form, proposed the following:—

### 1. *Dumaine Proposal*

F. C. Dumaine, Sr., had been in control of the company for about twenty years before 1943. Under a proposal made by him and F. C. Dumaine, Jr., RFC was to permit the whole of its $4,000,000 debt to remain outstanding at 4% per annum for a period of eight years from the date of reorganization. One-half of this debt was to be secured by a mortgage on the fixed assets of the company; the balance by a revolving general mortgage upon all the other assets of the company. F. C. Dumaine, Sr., was to guarantee payment of this latter half. There was no obligation on Mr. Dumaine's part to put in any additional funds by way of loan or investment; but, if he did make loans, the loans would bear interest at "normal rates." The RFC loan was to be reduced after January 31, 1953, but only out of net earnings. The stockholders would keep at all times 25% of their present investment, but the remaining 75% could be called at prices ranging from

$1 per share to the end of 1953 to $3 per share after 1962. Until completion of the calls, all of the stock would be held in a Voting Trust controlled by F. C. Dumaine, Sr., and F. C. Dumaine, Jr. Upon the termination of the Trust, the stockholders would retain 25% of their original holdings, uncalled; the management (not including F. C. Dumaine, Sr., or F. C. Dumaine, Jr.) would have about 9% and the remaining 66% would be distributed to jobbers and distributors or held for the benefit of employees.

## 2. Gellman Proposal

Mr. Gellman, President of an enterprise making watch cases, compacts and the like, and Norman B. Schreiber, President of a firm of consulting engineers, proposed to loan the Debtor $1,000,000 secured by one-half of the company's inventory and receivables, this half to include the finished watches and movements. RFC was to revise its loan so that $3,000,000 would be secured by the fixed assets; and $1,000,000 by the remaining half of the inventory and accounts and to be a revolving fund loan. The $3,000,000 loan was to be extended for fifteen years with interest at $2\frac{1}{2}\%$ per annum, the loan to be amortized by equal annual instalments, and RFC to make further loans for machinery. The unsecured creditors would be paid in full. The outstanding common stock would receive 75¢ par value of non-voting, non-cumulative 4% preferred stock of the reorganized company for each share of common stock. Messrs. Gellman and Schreiber would have all of the new common stock.

## 3. Bulova Watch Company Proposal

Bulova Watch Company, one of the large importers and manufacturers of watches, made a proposal on June 12, 1950. It stated that it did not wish to be in competition with the other proponents. Its proposal was that the $4,000,000 RFC loan would be extended for as long as the law would permit, and be divided into $2,500,000 secured only by the fixed assets and $1,500,000 by a mortgage on the other assets. Bulova would exchange $600,000 market value of its stock for all the outstanding Waltham stock. $1,400,000 would be invested by Bulova in the treasury of an operating company for working capital. Unsecured creditors would be paid in full.

## 4. Stockholders' Proposal

The stockholders' proposal, as modified by the Trustees, was based on a proposal by Teviah Sachs to invest $100,000 in stock of the company for preferred stock in that amount and a $\frac{1}{4}$ interest in the company's outstanding stock as of the date of consummation. RFC's loan of $4,000,000 was to be reduced to $2,000,000 by a processing and sale of a portion of the watch inventory, and as so reduced was to be extended for fifteen years. Sachs was to agree to pay an additional $200,000 for preferred stock in that amount and enough common stock to bring his holdings of the outstanding stock up to one-third. Stockholders were to have a right to subscribe to $400,000 of additional common stock at par, of which $300,000 was to be underwritten. Unsecured creditors were to be paid 50% in six months and 50% in twelve months. The stockholders' proposal, which ultimately as modified became that of the Trustees, was grounded upon the Trustees' expressed conviction that they would realize enough out of the watch inventory to reduce the RFC loan to $2,000,000 and still leave the company with enough assets, with the addition of the proposed investment by Sachs and the underwriters, to make the reorganization feasible. Thus it was clear that this proposal was the one which gave the stockholders the best opportunity to salvage their investment on the least expensive terms. I agreed with the Trustees, as stated by them in their plan, that the stockholders should have the first opportunity to salvage their investment. Under the Bulova plan the stockholders would give up their shares in the Debtor for 50¢ per share, payable in Bulova stock; under the Gellman plan they would have had 75¢ per share but in the form of a 4% non-cumulative non-voting preferred stock which would have been worth a good deal less than 75¢ per share; under the Dumaine plan they would have kept a $\frac{1}{4}$ interest, but were subject to an option to sell the remaining $\frac{3}{4}$ which might be exercised up to 1953 at $1 per share. As against these alternatives, the stock-

holders under the Trustees' plan in effect retained a ¾ interest in the company, and sold a ¼ interest to Mr. Sachs for $100,000, with an obligation to sell another 8⅓% interest for $200,000. From the point of view of the stockholders this insured to them the interest and incentive of Mr. Sachs to make his investment valuable. If Bulova's estimate of value was correct, a ¼ interest in the company was not worth over $150,000, and a ⅓ interest, $200,000. RFC was still in possession of the plant and inventory, the inventory was seasonal and subject to deterioration; the labor force was disintegrating and it was clear that the plant and inventory could not be taken from RFC without a struggle and only after the lapse of time; and even when possession of the plant and inventory would be obtained, there was still the problem of providing at least $500,000 of working funds. RFC's position at the time was that it was opposed to all of the plans submitted.

As required by sections 172, 173 of Chapter X, I referred the several plans to the Securities and Exchange Commission. After studying the matter, the Commission advised me that it elected not to make a report.

Accordingly there was left to me the decision which, if any, of the plans should be approved by me as fair, equitable and feasible. As already indicated, I concluded that I should approve the Trustees' plan for the reasons stated.

Subsequent events have supported the conclusion which was reached and embodied in a memorandum of June 30, 1950. In that memorandum I said:

"The Waltham Watch Company is a solvent concern with a very heavy inventory, but is unable to do business because of the lack of capital. It has somewhere in the vicinity of $500,000 in cash in local banks in a blocked account under the control of the Reconstruction Finance Corporation. Its heavy inventory must be liquidated whether there is a reorganization or not. This inventory has been estimated as being valued at between $3,000,000 and $4,000,000.

\* \* \* \* \* \*

"The Trustees' plan \* \* \* will insure the return of the company to its present owners, the stockholders. None of the plans submitted, including the Trustees' plan, has any guarantee of success, but permanent success could be assured if the Reconstruction Finance Corporation will release the blocked cash account to the Trustees. Whether or not the Reconstruction Finance Corporation will pursue such a course, it is worthwhile to make one last attempt to retain this strategic industry both for the City of Waltham and the nation. If the plan has the sincere cooperation of the creditors, the stockholders, and the governmental agencies designed to aid business and such governmental agencies as can utilize the wartime potentialities of this plant, much of the doubt as to the future would be removed. \* \* \*"

Pursuant to the direction contained in that memorandum and in order to aid the Trustees' plan of reorganization, an order was entered on July 10, 1950, authorizing the Trustees to take from RFC possession of all of the Debtor's assets upon which RFC claimed a lien, including the plant, machinery, inventory and cash, to process and sell the inventory and to transfer the RFC's lien to the net proceeds of that sale. RFC appealed from that order. The Court of Appeals, on December 21, 1950, affirmed the order (185 F.2d 791). While the appeal was pending RFC sought to have the operation of the order suspended; but that was refused by the Court of Appeals on August 7, 1950. On August 8, 1950, RFC tendered to the Trustees possession of the plant and inventory but not the Waltham collateral cash which then amounted to about $500,000. Since the Trustees had no means with which to operate or even guard the plant unless they had a substantial cash fund available to them, I instructed them to withhold accepting the tender of the plant and inventory without the cash. RFC continued its refusal to turn over the cash even in the face of a finding of contempt and a fine of $50,000 imposed by me on August 15, 1950. The Trustees were accordingly compelled to find some other way of obtaining the necessary cash. This was accomplished

by obtaining an immediate advance of $50,-000 through Mr. Sachs and promptly thereafter obtaining from customers advances of one-third of the purchase price of their orders. By this means a working fund of approximately $600,000 was obtained. By these means the Trustees were enabled to take possession of the plant and inventory September 12, 1950, and undertake the processing, completion and sale of the watch inventory for the 1950 Christmas season. Despite the short time left, and the difficulty of reassembling the necessary working force in the factory which had been shut down since February 3, 1950, the Trustees were able in operations conducted under the immediate supervision of Mr. Sachs to process and sell about 150,000 watches for approximately $3,200,000. The cost of this operation was about $600,000, thus leaving a net amount of about $2,600,-000. The foregoing result vindicated the judgment of the Trustees.

In view of this result, and the decision of the Court of Appeals affirming the action of this Court in its order of July 10, 1950, the Trustees were finally able to effect an agreement with RFC, January 18, 1951, which was, after notice to all parties in interest and a hearing, affirmed by the Court February 27, 1951. This provided for the immediate reduction of the principal of the RFC loan from $4,000,000 to $1,750,000, which has been done, and its further reduction by July 1, 1951, to $1,-500,000. Payment of the reduced balance of $1,500,000 is to be extended to December 31, 1960, at 4% per annum, subject to level payments of $10,000 monthly commencing August 1, 1951, to service first interest and then principal. The $1,500,000 balance is well secured by a mortgage on the plant, machinery, equipment, goodwill, trade-marks, trade-names and patents of the debtor. These have an estimated value on a going business basis of in excess of $3,-000,000, so that payment of the balance to RFC would seem to be amply secured.

The Trustees had hoped that RFC would be willing to continue the mortgage debt balance at $2,000,000. The consummation of the transaction at $1,500,000 reduces by $500,000 the available cash.

The Trustees have paid RFC, since January 1, 1951, $2,250,000 on account of principal, $173,000 in interest and $63,000 for care and preservation of collateral, i. e., a total of nearly $2,500,000.

An examination of the balance sheet attached to the Trustees' amended plan satisfies me that with careful management the Debtor will be able to function safely and satisfactorily. The Trustees have reported to me that they have orders for defense materials in hand and in reasonable prospect which should be of considerable value in attaining a successful rehabilitation.

The final formulation of the plan and its submission has necessarily awaited the final decision of the litigation and controversy between the Trustees and RFC. On January 16, 1951, RFC paid over the withheld Waltham collateral cash, and waived its further appeals. Upon being advised of these facts I remitted the $50,000 fine in a memorandum in which I said: "In allowing the petition to vacate the contempt order fine I am conscious of the fact that any fine levied against the Reconstruction Finance Corporation must ultimately be paid by the taxpayer whose taxes are already burdensome. With this in mind it is deemed wiser, since our order has been complied with, to vacate it, keep the record clear, and hope that in the future the Reconstruction Finance Corporation will extend its cooperative aid to the Waltham Watch Company to the end that it may be speedily reorganized both as a watch factory and as a defense plant."

The amended plan of April 16, 1951, differs in some respects from the plan which was before me on June 30, 1950. Essentially, however, it is the same. The differences in my opinion improve its fairness and do not substantially impair its feasibility. The differences may be briefly summarized:

1. The plan has been adjusted to reflect the arrangement with RFC embodied in the agreement of January 18, 1951.

2. The earlier version of the plan embodied an arrangement under which Teviah Sachs had agreed to pay $100,000 upon

consummation of the plan for which he was to receive $100,000 in preferred stock and enough common stock to bring his holdings up to one-fourth of the total common stock outstanding. On the basis of approximately 1,200,000 shares of common stock held by others, this would require an issue to Mr. Sachs of 400,000 shares to bring him up to one-fourth. The Trustees have concluded that the issue of a preferred stock at this time is undesirable, and omitting a present issue of preferred stock avoids difficulties in future financing. Mr. Sachs has agreed to the elimination of the preferred stock, and to accept 400,000 shares of common stock as complete consideration for his present payment of $100,-000.

3. Mr. Sachs had heretofore agreed to pay $200,000 for $200,000 in preferred stock and enough common stock to bring his holdings up to one-third of the outstanding common stock, payment to be made in the first year after the reorganized company had made net earnings of at least $100,000. Assuming that the full 400,000 shares offered to shareholders were taken up, it would require that Mr. Sachs receive enough shares to bring his holdings up to 800,000 shares to bring his holdings up to one-third, i. e.—

| | | |
|---|---|---|
| original issue | 1,200,000 | shares |
| Sachs | 400,000 | " |
| Stockholders | 400,000 | " |
| Total | 2,000,000 | shares |
| additional to Sachs | 400,000 | " |
| Total | 2,400,000 | shares |

Sachs' holding 800,000 = ⅓

Mr. Sachs has agreed to a proposal by the Trustees that in lieu of agreeing to purchase $200,000 in preferred stock and the additional 400,000 shares for $200,000, he and Gilbert Sachs, who has been associated with Teviah Sachs in the operations, be given an option, which may be exercised within four years and six months from the date of confirmation, to buy 350,-000 shares at 95% of the fair market value of the shares when the option is given. If present market prices prevail, this would give the company about $700,000 for these shares if the option is exercised instead of the $200,000 provided for in the contract. This is clearly to the advantage of the company.

4. As originally prepared by the Trustees, their plan provided for the immediate termination of the Voting Trust set up under the 1949 Plan. Further consideration has persuaded the Trustees that it would be to the advantage of all concerned if the Trust were reconstituted and continued for a short time with Mr. Hudson, the present Trustee, as one of the Trustees, and two of the disinterested Trustees as the remaining Trustees. Messrs. Kaplan and Hurley have signified their willingness to serve in this capacity. The Plan accordingly provides that the Voting Trust will terminate one year after consummation but may be terminated prior thereto if a majority of the Voting Trustees so determine, and that until it does terminate Messrs. Hudson, Kaplan, and Hurley will act as Voting Trustees, and that if any vacancy occurs it will be filled by this Court.

The plan as now amended eliminates the provision for an underwriting and commissions and consideration to the underwriters, unless and to the extent that the disinterested Trustees elect to arrange for an underwriting. The plan also provides for overriding subscriptions. These modifications are in my opinion appropriate.

On April 25, 1951, I referred the amended plan to the Securities and Exchange Commission under Sections 172 and 173, and I have been advised by the Commission that it has elected not to file a report on the amended plan.

The formulation and submission of the amended plan now affords the parties in interest the opportunity to preserve this vital enterprise to which I referred in my memorandum of June 30, 1950.