**In the Matter of NEWAL, INC., Debtor.**

**No. 65-254-C.**

United States District Court
D. Massachusetts.

March 18, 1965.

Harold Lavien, Boston, Mass., for James W. Noonan, Trustee.

Joseph B. Manello, Widett & Kruger, Boston, Mass., for James Talcott, Inc.

CAFFREY, District Judge.

This matter came on for hearing on petition of the Trustee for an order authorizing use of proceeds of accounts receivable and for other relief, and on petition of James Talcott, Inc., alleged (and assumed for purposes of this memorandum) to be a secured creditor, for an order to require the Trustee to turn over funds and for other relief.

Both petitions relate to a proceeding for reorganization of a corporation filed under the provisions of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., as amended. The debtor's petition for reorganization was filed on March 8, 1965 and an order approving the petition was entered on the same date. An order appointing James W. Noonan, Esq. as Trustee and fixing a time for a hearing on objections to the continuance of the Trustee in possession was entered on March 9, 1965. The petition of James Talcott, Inc. to have an auditor on the premises of the debtor and a petition of the Trustee for an order allowing the use of proceeds of accounts receivable, and a petition of the Trustee for authority to employ a managing agent, all were allowed on March 12. A petition of the

---

3. Alaska Freight Lines, Inc. v. Weeks, 18 F.R.D. 64, 66 (D.C.D.C.1955).

Trustee for leave to employ Harold Lavien, Esq. as counsel was allowed March 16.

At the conclusion of today's hearing, counsel were orally advised that due to the imminence of an obligation of the Trustee to meet the weekly payroll, in the amount of approximately $34,000, the Court was prepared to and did advise the parties orally that the petition of James Talcott, Inc. for an order requiring the Trustee to turn over funds was denied, and that the petition of the Trustee for an order directing James Talcott, Inc. to turn over to the Trustee its collection of accounts receivable, for leave to the Trustee to use funds presently in his possession as well as the funds turned over by James Talcott, Inc., and for other relief, was allowed.

Counsel were also advised that this memorandum, setting forth the underlying legal and factual basis for the rulings on the two motions, would be filed.

I find that Newal, Inc. is a continuation under a changed name of a Massachusetts corporation formerly known as the Waltham Precision Instrument Company, Inc., and that the corporate name was changed to Newal, Inc. in April 1964. Waltham Precision Instrument Company, Inc. is the successor of the Waltham Watch Company, which was the subject of a successful Chapter X Reorganization proceeding in this court, described in the case of R.F.C. v. Kaplan, 185 F.2d 791 (1st Cir. 1950). Newal, Inc. makes clocks and timing devices and electronic devices. Much of its work is done on contracts with the United States Department of Defense. Some of its work is done for substantial private businesses, such as Westinghouse Electric Corporation. It was stipulated at the hearing that Newal is the sole producer in the United States of some devices used as missile components and of the A–13 running-time meter which is known as an aircraft clock and is made under contract with the Air Force. I find, on the basis of the testimony of Arthur Weiner, a program analyst attached to the Army Munitions Command, Picatinny Arsenal, Dover, New Jersey, that Newal is the sole American manufacturer of a rocket fuse, Model M–421, which is an essential component of several missiles presently used by the armed forces of the United States and its allies. Two of these missiles are respectively identified as the "Honest John" and the "Little John."

Mr. Weiner testified, and I find, that the cessation of production of the M–421 rocket fuse would be detrimental to the defense posture of the United States and its allies, here and abroad, and that because of its inclusion in the two missiles named above, the M–421 rocket fuse has international significance and his office strongly recommends that, if feasible under the law, this company be kept in production. The Defense Department has taken no action as of this date to obtain an alternate source of M–421 rocket fuses.

Mr. Weiner stated, and I find, that he was aware of the record of Newal in making shipments to the Department of Defense under its contracts and was not aware of any intention or plan on the part of procurement officials or contracting officers in the Department of Defense to cancel any outstanding contract with Newal on the basis of any alleged slowness or lateness of Newal in meeting its shipping dates under the contract.

John Cancian, Esq., of counsel for the First National Bank of Boston, testified, and I find, that as counsel for the bank he engaged in several conferences on March 16 and 17, 1965, looking toward a possible loan by the First National Bank to Newal on the basis of trustee certificates, the proceeds of which would be limited to the payment of current and future expenses and which would not be used for the purpose of paying off lenders who have previously made loans to Newal.

Mr. Cancian further testified, and I find, that he requested counsel for the parties to obtain an adjournment from yesterday to today of the hearing held this date and that, if possible, he would have preferred an additional week's continuance of the hearing held this date to

allow further consideration of the proposed loan by the bank. Because the matter was not continued for an additional week, the First National Bank concluded that it would not make the loan, primarily for the following reasons, (1) Newal was not regularly a bank customer; (2) it was a successor of the Waltham Watch Company with which the First National Bank had had an unhappy financial experience approximately thirteen years ago; (3) that information available to the bank upon which a decision would be predicated was still incomplete; and (4) most importantly, the bank officers and its counsel had no confidence that they could work out an accommodation with James Talcott, Inc. which is vigorously pressing the priority of its claimed liens.

Mr. Cancian testified, and I find, that the First National Bank caused an intensive examination to be made of Newal about six months ago in connection with a loan to Newal at that time under consideration; that the examiner who made the investigation recommended that the loan be made and that a senior bank officer declined to accept the recommendation of the examiner and the loan was not made.

William H. McMorrow, employed by the Trustee as Managing Agent for Newal, Inc., testified with regard to several corporations he has successfully managed in the course of Chapter X reorganizations, including seven years experience acquired as a top executive of the Waltham Watch Company during its reorganization. I find that he is highly experienced and knowledgeable in the management of corporations in process of reorganization.

On the basis of Mr. McMorrow's testimony I find that since the commencement of his employment as managing agent, he has reduced the executive overhead of Newal by $130,000, by discharging certain of the former officers, including the former President, Mr. Ripley, and former Vice-President in charge of production, Mr. Cicala; that he has examined schedules, one of which is a schedule of shipments and expenditures for the period March 15 to June 30, 1965, and the other a "cash flow sheet," which Mr. Doyle, the Comptroller of Newal, prepared on the basis of existing contracts and other corporate records, and that he has examined a projection prepared on the basis of these contracts. The substance of his testimony was that having in mind the backlog of contracts, the inventory on hand, the normal "generation" of new accounts receivable, the fact that approximately 325 employees, about 250 of whom are skilled craftsmen in such trades as watch assembling, gyro assembling, tool making, engineering, etc., are on the payroll and working, that he has already put into effect a plan substantially reducing overtime operation and expense, that he has checked against Mr. Doyle's schedule the actual stage of completion of all contracts presently being worked on, that he has specific plans to improve purchasing procedures, all manufacturing schedules and all delivery schedules, that partially completed products would suffer a severe drop in value if operations ceased, he believes, on the basis of these factors, that it is probable that the company can be "turned around" by the 30th of June next. I accept this opinion.

In accepting this testimony, I have in mind that this company was profitable in the years 1962 and 1963 and that it had a deficit operation in 1964, caused primarily by a split of opinion in the top management and by a failure on the part of the company to meet its production schedules. Mr. McMorrow testified that he believes the company has a present net worth of 1.4 or 1.5 million dollars, and that a cessation of operation at the plant, either for lack of working capital or any other reason, would make successful reorganization impossible, because cessation would entail cancellation of the valuable backlog of contracts and loss of a number of the skilled workers presently employed, and I so find. He testified that the company does not own the building that it occupies in Waltham, but leases same, and that it owns the Connecticut plant which was recently constructed but does not have a large equity in it; that

the machinery in the Waltham plant is covered by two mortgages and the machinery in the Connecticut plant is leased from United Leasing. United Leasing, James Talcott, Inc. and the Newton-Waltham Bank are the only secured creditors. Mr. McMorrow was of the opinion that other valuable assets of the company are several subsidiary corporations which it either owns or controls and certain investments in other companies. Finally, Mr. McMorrow testified, and I find, that a plan to reorganize this corporation can be successfully formulated.

I do not credit the opinion of the witness Mr. Kurau, called by Talcott, particularly those portions of his testimony dealing with the extent of the probable 1964 loss for the company which Mr. Kurau himself characterized as a guess.

I conclude that the Trustee has sustained his burden of proving:

(1) that there is an imperative need on the debtor's part to obtain funds for the payment of essential operating expenses;

(2) that such funds are not available to the Trustee and that efforts by the Trustee to borrow from the First National Bank of Boston, as well as from James Talcott, Inc., have failed;

(3) that it appears that the debtor has a net worth of about 1.4 million dollars and was solvent at least up through the end of 1964;

(4) that cessation of operations would cause a very substantial loss by reason of a drop in the value of inventory;

(5) that there is a reasonable likelihood that the debtor may be reorganized in accordance with Chapter X within a reasonable time under a plan which is fair, equitable and feasible;

(6) that the granting of the Trustee's petition in all likelihood will not substantially impair the security of James Talcott, Inc.; and

(7) that Talcott will be kept informed of the progress of the debtor's business by reason of this Court's allowance of Talcott's petition to have an auditor present on the premises of the debtor.