Frank S. BLACKFORD, as Trustee in Bankruptcy of Munro-Van Helms Company, Appellant,

v.

COMMERCIAL CREDIT CORPORA-TION, Appellee.

No. 17243.

United States Court of Appeals Fifth Circuit.

Jan. 23, 1959.

Rehearing Denied April 10, 1959.

Morris K. Sirote, George I. Case, Jr., and John Glasser, Birmingham, Ala., for appellant.

Kenneth Perrine, Alfred Swedlaw, Birmingham, Ala., Leader, Tenenbaum, Perrine & Swedlaw, Birmingham, Ala., of counsel, for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is a bankruptcy case involving the validity of an assignment of accounts receivable by the Bankrupt, Munro-Van Helms Company, to CCC, the appellee, Commercial Credit Corporation.[1]

After filing enough pleadings to consume 360 pages of the printed record, the trial's tone was set by a ten-page opening introductory colloquy of confusion in which all participants demonstrated with the candor born of impromptu their general lack of comprehension and agreement as to just what issues were about to be tried. And, days later, the trial ended with the last pages of testimony intertwined with the continued and concluding dispute between counsel as to just what the trial had been about. Not a little of the confusion is traceable to the complex prolixity of the pleadings in which a basic claim might be set forth as many as three or four times depending on the number of legal theories contrived or asserted. "Waivers" or "withdrawals" of many of these was apparently an effort—almost nowhere successful—to eradicate the lawyer-made complexity and restore to the pleadings their rightful office under the Civil Rules to simplify, not confuse, the issues. Small wonder that Judge Grooms had to follow his carefully constructed initial opinion and judgment with an amending order based on his ruling on CCC's motion for summary judgment, in which he acknowledged that issues he had understood to have been waived by the Trustee were in fact left in the case. Thus has it become our task to sift through 616 pages of record and 175 pages of briefs and supplemental briefs, to alternately save and discard, and formulate the issues before us.

## I.

### Background.

But before such an undertaking it is helpful to start "in the beginning." The transactions between Bankrupt and CCC had their inception in a contract made in May 1949. This contract was the basis for the future dealings between the two parties in which CCC would purchase, and Bankrupt would sell, Bankrupt's accounts receivable. Of course, "assignment of accounts receivable," or "non-notification financing" is an accepted commercial practice and is recognized and now provided for by statute in many states. The specific details of the contract will be dealt with more fully later. In general, it provided that CCC would purchase acceptable accounts receivable from Bankrupt from time to time advancing 85% of the purchase price immediately and the remaining 15% upon payment in full by the account debtor. Bankrupt was to be billed for a monthly service charge figured on a percentage of the "average daily outstanding face of accounts during such month." Bankrupt was authorized to collect on the accounts and in fact did so; warranted the payment in full by account debtors of all accounts; agreed to repurchase from CCC all delinquent accounts; and assumed liability for attorney's fees, court costs and other expenses incurred in collecting on the accounts or for amounts owed under the contract provisions. The contract stated that it should be governed by the laws of Maryland.

This whole case turns largely on the fact that Section 209 of the Alabama Assignment of Accounts Receivable Act of 1949, Ala.Code, Tit. 39, §§ 207–214 (1940), (referred to as ARA) requires filing of a notice of such assignments. Presumably pursuant to such Act the parties filed a "Statement of Assignment of Accounts Receivable" or renewal thereof in October of 1949, 1950, 1951,

---

1. The Trustee, Blackford, contests the validity and seeks to recover the amounts collected on the accounts for the benefit of creditors. CCC asserts the propriety of the transfer and their right to its fruits.

1952 and December of 1952 with the Office of Probate Judge in Talladega County, Alabama (the residence of Bankrupt). There followed a continuous course of business dealings between Bankrupt and CCC until the filing of a Chapter XI, 11 U.S.C.A. § 701 et seq. petition in bankruptcy by Bankrupt on July 30, 1953. Adjudication of bankruptcy followed on April 12, 1954.[2]

Upon the filing of the petition in bankruptcy the Receiver in Bankruptcy took possession of the uncollected accounts receivable then in the possession of CCC, over its objection, by virtue of an order of the Referee. This order was subsequently reversed by Judge Lynne on April 22, 1954, upon a finding that the Referee was without summary jurisdiction,[3] and the remaining uncollected accounts were thereupon turned over to CCC along with the funds already collected by the Receiver on the other accounts.

## II.

### Issues.

With this history behind us we attempt to ascertain the questions which were presented and those still in issue in this case. Stripped of all the voluminous charge and countercharge, amendment and reply, the Trustee advanced essentially these claims.

[III] Accounts assigned prior to bankruptcy but collected subsequent to it were invalid because
 (A) the recorded notice of assignment was defective under ARA, or

 (B) even though sufficient, the assignments were in fraud of creditors under Alabama law.

[IV] Accounts assigned prior to bankruptcy and collected prior to bankruptcy were invalid because of
 (A) a failure to comply with ARA, or
 (B) even though complied with, assignments were in fraud of creditors under Alabama law.

[V] Accounts assigned within four months, or one year, of bankruptcy were voidable preferences under section 60(a) 11 U.S.C.A. § 96(a) or invalid under section 67(d) (2), 11 U.S.C.A. § 107(d) (2).

[VI] Several claims involving miscellaneous issues such as
 (A) usury,
 (B) post-bankruptcy assignments,
 (C) assignment of additional security,
 (D) collections subsequent to adjudication,
 (E) attorney's fees and expenses.

## III.

### Pre-Bankruptcy Assignments— Post-Bankruptcy Collections.

#### (A) Defective ARA Notice.

■ This claim which was listed above as [III] is the most serious both

---

**2.** Two relatively insignificant details must be noted for accuracy. (1) The contract was originally between Bankrupt and Commercial Credit Company, Inc. of Maryland. On December 31, 1952, pursuant to a plan of liquidation, Commercial Credit Company, Inc., of Maryland was merged into Commercial Credit Corporation. It thereby assumed all its predecessor's rights and liabilities, Bankrupt agreed to continue doing business with Commercial Credit Corporation, and did

so. We consider this to be of no significance. The two are indiscriminately referred to throughout this opinion as "CCC," and may be distinguished, if need be, by reference to the December 31, 1952 date. (2) The contract specified 80%–20% terms, but was subsequently amended (3/6/52) to 85%–15% and is so treated throughout this opinion.

**3.** Except that it determined that the trustee must resort to a plenary suit, not

**102**

in content and amount.[4] This relates to assignment of accounts receivable made to CCC during April through July 1953. Collections of the accounts from account debtors were all made after bankruptcy.

The principal attack disregards any assertion of knowledge of insolvency or of fraud, either actual or constructive, under Alabama law. The attack is the frontal one that the assignments were defective under ARA because the recorded notice specified the assignee's (CCC's) place of business as "Baltimore, Maryland" rather than Montgomery, Alabama, the place designated in certain other statutory filings. Voidable thus under the State law, the transfer was ineffective against the Trustee. Bankruptcy Act, § 70(e), 11 U.S.C.A. § 110(e).

Except in this one detail there is no dispute about the statutory adequacy of the assignment or notice. The notices were otherwise in the proper form filed at the right time, and in the office provided by statute.

It is not necessary to go beyond the language of the Act itself to sustain Judge Grooms' opinion and judgment on this point that CCC complied with ARA.

The ARA[5] provided that "a statement" shall be filed "containing (a) a

summary proceedings, this action has no significance as res judicata, prior unappealed from determination, or otherwise. Cf. Nicholas v. Cohn, 5 Cir., 1958, 255 F. 2d 301, 304.

4. Assignments were made from May 12, 1949 (the date of the contract between

CCC and Bankrupt) until the filing of the petition in bankruptcy. The assignments involved under this claim, however, are limited to those during April through July of 1953. Many figures are referred to in this context. They are briefly tabulated for ready reference below.

| Explanation | | Amount |
|---|---|---|
| Face amount of accounts assigned April–July 1953 | | $125,125.57 |
| Collected by Receiver 8/10/53–4/22/54; returned to CCC by Court order 4/22/54, see note 3, supra. | | $108,321.42 |
| Cash balance due CCC from Bankrupt under contract, as of August 10, 1953 | $100,939.49 | |
| Charges and collection expenses due CCC from Bankrupt under contract on $125,125.57 | 14,675.50 | |
| Total due CCC from Bankrupt as of August 10, 1953 | | $115,614.99 |
| Total held by CCC 6/17/55 of the $125,125.57 including the $108,321.42 turned over 4/22/54 | | $109,897.97 |

If the Trustee succeeds in this claim he would recover the $109,897.97, above, plus the remaining uncollected accounts. Conversely, if CCC prevails it will be entitled to the $115,614.99, above.

———————◆———————

5. Section 209 of the Act, which comprises section 207 through 214, provides:

"§ 209. Filing statement of assignment, renewal statement, notice of cancellation or affidavit of continuance.—(1) Any person undertaking or having undertaken the acceptance of or contemplating the acceptance of assignment or assignments of accounts receivable is entitled to file, in the office of the judge of probate of the county as hereinafter provided, a statement, signed by the assignor and assignee of such accounts receivable, containing (a) a designation of the assignor and assignee, and of the principal place of business of each, with-

designation of the assignor and assignee, and of the principal place of business of each, within this state, if any; * * *." Section 209 continues, "The following form of statement (or any other form of statement containing substantially the same information) shall suffice for the purpose of this Act, viz.: * * *." A model form then follows, including, "The principal place of business of assignor in the State of Alabama is at . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ,"

(Street Address) (City) (County)

and, "The principal place of business of assignee is at . . . . . . . . . . . . . . . . . . . . . . ."

(Street Address) (City) (County)

The statement then "shall be filed in the office of the judge of probate for the county in which assignor's principal place of business within this state is located."

The two words "if any" following "place of business * * * within this state" certainly indicate that the Act did not consider a "principal place of business" within Alabama as a prerequisite to the protection it affords. This interpretation is strengthened by other provisions as well, as, for example, the comma after "each" ("the principal place of

business of each, within this state, if any," rather than, "the principal place of business of each within this state, if any"). The "any other form * * * containing substantially the same information" liberality is consistent. And the statutorily approved forms themselves demonstrate a double standard by the provision that "the principal place of business of assignor *in the State of Alabama* is" while that for the assignee is simply "the principal place of business of assignee is" with no reference to location in Alabama. (emphasis supplied)

The Trustee's contention that the notice should have specified Montgomery, Alabama, does not rest on the fact that CCC's office there was engaged in accounts receivable financing or that, in contrast to the many other of its offices located in Alabama, Montgomery was the *most* principal. He could not have succeeded had he made the attempt. For the facts clearly justified the District Court's conclusions to the contrary. CCC had an office in Montgomery which, like many others throughout the state, was engaged in various forms of consumer and floor plan financing for household appliances, automobiles, and the like. But these of-

---

in this state, if any; and (b) a statement that the assignor has assigned, or intends to assign to assignee, one or more accounts receivable.

"The following form of statement (or any other form of statement containing substantially the same information) shall suffice for the purposes of this chapter, viz.:

" 'Statement of Assignment of Accounts Receivable'

" 'Date . . . . . . . . . . . . . . . . . . . . . . . . . .

" '. . . . . . . . . . . . . . . has assigned or intends to assign one or more accounts receivable to . . . . . . . . . . . . in accordance with the Alabama Assignment of Accounts Receivable Act.

" 'The assignor is . . . . . . . . . . . . . . . . . .
(an individual, a
. . . . . . . . . . . . . . . . . The principal place
corporation, a partnership)
of business of assignor in the State of Alabama is at . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Street Address) (City) (County)

" 'The assignee is . . . . . . . . . . . . . . . . . .
(an individual, a
. . . . . . . . . . . . . . . . . The principal place
corporation, a partnership)
of business of assignee is at . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
(Street Address) (City) (County)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ,'
(Assignor) (Assignee)

"Such statement shall be filed in the office of the judge of probate for the county in which assignor's principal place of business within this state is located.

* * *

"(3) Presentation for filing of the statement prescribed in subsections 1 and 2 of this section, and payment of the filing fee, shall constitute filing under this chapter, in favor of the assignee, as to all accounts receivable assigned by assignor to assignee in accordance with the provisions of section 208, and which shall be assigned within one year after the date of such filing, which period of one year shall be the effective period of such statement as sometimes referred to in this chapter. * * *."

fices were completely independent of each other, operating under the supervision of the Atlanta division office, and Montgomery was not the most prominent. And none of them, and certainly not Montgomery, had anything to do with accounts receivable financing, all of which was conducted directly by the home office in Baltimore.

It is rather the Trustee's contention that the term "principal place of business" in ARA was intended to refer to the comparable term in other statutes concerning the filing of corporate papers. This was expanded somewhat to a contention that if the legislature did not intend specifically to make the terms synonymous, any actual designations of a statutory "principal place of business" would be conclusive. Underlying this argument was the admitted fact that pursuant to Ala.Code Tit. 51, Secs. 340 and 345 (1940), in its application for permit to do business as a foreign corporation, and under Tit. 51, Sec. 351, in its franchise tax return, CCC indicated as its "principal place of business in Alabama" simply "Montgomery," and as the name of their authorized agent, Fred and Richard Ball, Attorneys, 717–720 First

National Bank Building, Montgomery, Alabama.

We do not think that in the light of the purposes of the ARA any such artificial result should be compelled. The ARA reflects in its preamble that it was enacted "all in order to promote trade and commerce by facilitating the sale and pledge of accounts receivable and to eliminate fraud in connection with secret assignments." The protection of creditors against fraudulent assignments was, of course, important. But in its historical setting what precipitated this, and similar legislation across the nation, were the judicial decisions which were thought unduly to restrict and encumber this much needed and legitimate form of business financing.[6]

We would close our eyes to reality if we were to conclude that Alabama, enacting a statute designed to surmount these barriers, intended that it was to be interpreted in a way to raise new, and perhaps even more difficult, hurdles.[7]

Approaching it, as Alabama requires in the light of common sense and business practicalities, there was substantial compliance. The naming of the statutory agent, or the designation of his office

6. Such operations have been fully dealt with in two fine articles by Maximilian Koesler, Assignment of Accounts Receivable, 33 Calif.L.Rev. 40 (1945), and New Legislation Affecting Non-Notification Financing of Accounts Receivable, 44 Mich.L.Rev. 563 (1946). See also, Ribaudo v. Citizens National Bank, 5 Cir., 1958, 261 F.2d 929; Costello v. Bank of America National Trust & Savings Ass'n, 9 Cir., 1957, 246 F.2d 807; M. M. Landy, Inc. v. Nicholas, 5 Cir., 1955, 221 F.2d 923, 53 A.L.R.2d 1385.

7. The case of Cobb v. Central of Georgia Ry. Co., 1922, 208 Ala. 134, 93 So. 845, so heavily relied upon by Trustee does not require a contrary result. That case did not involve the validity of the recorded mortgage or whether it charged persons with constructive notice. That case dealt solely with the place of recordation of railroad rolling stock, i. e., who was to get the recording fee. It concluded that the Railroad could not assert its principal place of business was in Savannah, Georgia, when in fact it had

Alabama places of businesses and had indicated one of them as its principal place of business for purposes of permission to do business as a foreign corporation. In our case there is no question of compliance with the *place* of recordation requirement. Section 209 provides, "Such statement shall be filed in the office of the judge of probate for the county in which *assignor's principal place of business within this state* is located." This was fully complied with. By the same token, Fairbanks Steam Shovel Co. v. Wills, 1916, 240 U.S. 642, 36 S.Ct. 466, 60 L.Ed. 841, and similar cases relied upon by Trustee, dealt with the place for recordation for statutory purposes rather than a mere incidental indication of "place of business." Nor are others, similarly pressed, controlling; e. g., United States v. Suring State Bank, D.C.E.D.Wis.1957, 150 F.Supp. 60; People ex rel. Knickerbocker Press v. Barker, 1895, 87 Hun 341, 34 N.Y.S. 269, affirmed 147 N.Y. 715, 42 N.E. 725; Application of Edmund J. Rappoli Co., 1957, 5 A.D.2d 758, 169 N.Y.S.2d 376.

as the address would not have afforded to any creditor, actual, potential, or theoretical, any more information than that reflected by the recorded notice. Inquiry in either case would have ended in Baltimore, Maryland. That was the place indicated.

The District Judge was right and we affirm his conclusion on this phase.

### (B) Assignments Invalid As in Fraud of Creditors.

The Trustee also seeks to recover the $125,125.57 in assigned accounts (and in $109,897.97 thereof already collected) in claims based upon theories of fraudulent transfers.

These claims take a double thrust, and were decided adverse to Trustee on summary judgment. It is contended that the contract was but a cover up for a secret trust by which terms Bankrupt could reclaim the accounts (and certainly the 15%) purportedly irrevocably conveyed to CCC. It is further contended that the very fact that what was made to appear a sale was in law but a security device for a loan made this a transfer in fraud of creditors.

Such contentions are, of course, bottomed on Section 70(e) of the Bankruptcy Act, 11 U.S.C.A. § 110(e), and the necessary State law, in this instance Sections 1 and 7 of the Alabama Code, Title 20.[8]

This question is one which Judge Grooms felt had been waived by the Trustee during the trial, subsequently found had not been, and resulted in his amending his judgment, and issuing an "Order formally ruling on Defendant's Motion for Summary Judgment," in which he ruled out any possibility of recovery on the theory that CCC "had reserved a lien by way of security."

This claim is of a serious and substantial nature and requires essentially a two-step analysis. Was the transaction between Bankrupt and CCC, as spelled out in the contract, in the nature of a loan rather than a sale? If so, how does this affect the outcome? It is only after these questions have been answered that consideration may be given to the questions of whether this was a conveyance in trust for Bankrupt or in fraud of creditors, and the extent to which the ARA changes the law in this regard.

### Relationship Between the Parties.

■ Of course, "it is not only the right but the duty of the court to probe behind the written contracts, and to examine all facts and circumstances which shed any light upon the true nature of the transaction." General Motors Acceptance Corp. v. Mid-West Chevrolet Co., 10 Cir., 1933, 66 F.2d 1, 4. Thus does it become our duty to examine the contract in more detail to ascertain the true nature of the relationship it created.

■ The contract begins, "[CCC] will, from time to time, *purchase* from Customer [Bankrupt] such accounts * * * as are acceptable to [CCC] and will advance to [Bankrupt] at the time of *purchase* eighty-five Percent (85%) of the net face value of Accounts, * *." (Emphasis supplied.) So far this is certainly language of a sale.

However, the following provisions would suggest that this was a security

8. "§ 1. Conveyances of personal property in trust for the grantor are void as creditors.—All deeds of gift, all conveyances, transfers, and assignments, verbal or written, of goods, chattels, or things in action, made in trust for the use of the person making the same, are void against creditors, existing or subsequent, of such person."

"§ 7. All instruments made to hinder, delay, or defraud persons, void as to them.—All conveyances, or assignments in writing, or otherwise, of any estate or interest in real or personal property, and every charge upon the same, made with intent to hinder, delay, or defraud creditors, purchasers, or other persons of their lawful suits, damages, forfeitures, debts, or demands; and every bond, or other evidence of debt given, suit commenced, decree or judgment suffered, with the like intent, against the persons who are or may be so hindered, delayed, or defrauded, their heirs, personal representatives and assigns, are void." Ala. Code 1940 Tit. 20, §§ 1, 7.

device. "At the end of each month [CCC] will bill [Bankrupt] for charges in connection with the purchase of Accounts during such month and for the services and considerations specified herein." Such charges were to be calculated "upon the amount of the average daily outstanding face of Accounts during such month: * * *." These rates varied from ⅟₃₁ of 1% per day on less than $25,000, to ⅟₄₂ of 1% per day on amounts over $200,000. Such calculations bear a close resemblance to common interest rates—equivalent to 8% to 12% a year. This is coupled with a provision that "[Bankrupt] warrants, guarantees and agrees [that] each Account will be paid in full on or before the date shown as its due date on the assignment thereof, and if not so paid, [Bankrupt] shall upon demand promptly pay any amounts represented to be owing thereon to [CCC] * * *." There are, moreover, provisions that Bankrupt will make good to CCC any account prior to its due date if the account debtor is in uncertain financial circumstances, Bankrupt will pay CCC for any credits they must make to account debtors, and other similar provisions essentially guaranteeing CCC that they will suffer no loss on the transaction. There is a special provision that Bankrupt will pay CCC "all attorneys' fees, court costs, and all other expenses" which they may incur in collecting the amounts due them from either account debtors or Bankrupt. Finally, there is the provision that "[CCC] authorized and permits [Bankrupt] to collect Accounts from debtors."

Upon close analysis this is essentially the same as though a loan, as such, was made and the accounts receivable assigned as security therefor. Except for terminology used this result was as though CCC had loaned Bankrupt over $100,000 from April through July of 1953 and Bankrupt had agreed to repay this amount. As security for the loan Bankrupt would have assigned to CCC its interest in about $125,000 worth of accounts receivables. The scheme envisioned that payments would be made from Bankrupt to CCC from the proceeds of the accounts receivable as they were collected. The interest rate would fluctuate from 8% to 12% on the unpaid balance of the loan, but would be figured, for purposes of the contract, on the basis of "outstanding face of Accounts." If Bankrupt were to cease payment of the loan, it then became immediately due ("then [Bankrupt] will, on demand, repurchase from [CCC] all of the outstanding and unpaid Accounts"). And in the event CCC had to sue Bankrupt to collect the balance of the loan, they would have also been entitled to the traditional attorneys' fees and expenses.

This is in no way a unique conclusion on our part. The Supreme Court, confronted with a similar contract, adopted the conclusion of the District Court that "insofar as the contracts in question here use words fit for a contract of purchase, they are mere shams and devices to cover loans of money at usurious rates of interest." Home Bond Co. v. McChesney, 1916, 239 U.S. 568, 575, 36 S.Ct. 170, 173, 60 L.Ed. 444, 448. In a similar case the Second Circuit concluded, "in decisions construing usury statutes, contracts of this kind have uniformly been held to be collateral loans. We see no reason to give them any other intepretation here." (citing many cases) In re Gotham Can Co. (Merchants' Transfer & Storage Co. v. Rafferty), 2 Cir., 1931, 48 F.2d 540, 541. The Third Circuit reached a similar conclusion in Brierley v. Commercial Credit Co., 3 Cir., 1930, 43 F.2d 730. And so did we. Commercial Security Co. v. Holcombe, 5 Cir., 1920, 262 F. 657, 661, 662.

But our conclusion that this was a loan with security rather than a sale really solves nothing. The fact remains that there was an assignment of accounts receivable which, under our holding, in all ways complied with, and was protected by, the ARA. Thus, if the cart is to be upset, it must be by virtue of the impact of other Alabama statutes upon this loan transaction.

## Alleged Secret Trust.

■ But before discussing the merits of the Trustee's assertions in terms of Title 20, Sections 1 and 7, it is necessary to briefly examine the extent to which these statutes may have been tempered in the area of accounts receivable by the ARA. It is true that Section 213 of the ARA provides, "this chapter shall not be construed as superseding or repealing any other laws effective in Alabama relative to the subject matter covered by this chapter * * *." But an equally significant provision a few lines later cannot thereby be rendered a nullity: "the purpose of this statute is to provide an *exclusive method* whereby the assignees of accounts receivable *may perfect title thereto against creditors* * * *." (Emphasis supplied.) Section 207 has defined "assignment" as "any transfer, sale, pledge or mortgage of an account * * *." Therefore, while we expressly do not hold that the ARA makes actual fraud permissible in these transactions, what is otherwise provided for by the ARA cannot be rendered of no effect by treating such transactions as some form of constructive fraud on the basis of these prior statutes and their judicial interpretations.

What is the meaning of Title 20, Section 1? This was found to have been violated, for example, in Pace v. Wainwright, 1942, 243 Ala. 501, 10 So.2d 755, where the grantor of land under a deed absolute retained a secret trust that the grantee would reconvey the property to her on demand, and that she could move onto the property and make it her home. See also Armstrong v. Miller, 1939, 238 Ala. 17, 189 So. 74. We do not believe this is such a case. There was no evidence of any agreement, nor indeed of any reason for one, whereby Bankrupt could repurchase from CCC the assigned accounts receivable on demand. The only analogous provisions in the contract were the ones that "[Bankrupt] shall upon demand promptly pay any amounts represented to be owing [on delinquent accounts] to [CCC]" and "if any act amounting to a business failure by or against [Bankrupt] should be committed then [Bankrupt] will, on demand, repurchase from [CCC] all of the outstanding and unpaid Accounts * * *." The demand here is, of course, that of CCC not Bankrupt, and is designed as additional protection for CCC not as a secret trust for Bankrupt.

## Alleged Fraudulent Transfers.

However, the Trustee has asserted another claim based on Section 7 of the same title, note 8, supra, which provides in pertinent part "assignments [of] personal property * * * made with the intent to hinder, delay, or defraud creditors * * * are void."

■ Of course, it is true that a fraudulent conveyance may take many forms. Thus, a mortgage, Drain v. F. S. Royster Guano Co., 1936, 231 Ala. 422, 165 So. 239, a collusive suit, Weingarten v. Marcus, 1899, 121 Ala. 187, 25 So. 852, or a collusive writ of attachment, Gassenheimer v. Kellogg, 1899, 121 Ala. 109, 26 So. 29, have all been held to be vehicles for the violation of this statute. Surely it would also be possible to use an assignment of accounts receivables in this way. But there must be more than creditors and a conveyance. As the Alabama Supreme Court has declared in the leading case of Adkins v. Bynum, 1896, 109 Ala. 281, 19 So. 400:

"In reviewing these rulings it becomes necessary to decide a question which has not heretofore been adjudicated by this or any other court, so far as our investigation has disclosed. * * * It is laid down in the books, as a general proposition, that the concurrence of three elements is essential in the constitution of a fraudulent conveyance; that is to say, before a conveyance can be declared fraudulent it must be made to appear that there is (1) a creditor to be defrauded; (2) a debtor intending to defraud; and (3) a conveyance of property out of which the creditor could have realized his claim, or some portion thereof. * * * In

the case at bar there was a creditor to be, and who claims that he was, defrauded, and there was a debtor. So much is clear. But it is not clear that such debtor is shown by what he did, to have intended to defraud the creditor, nor that what he did had the effect of hindering, delaying, or defrauding the creditor; * * *."

This case involved the mortgage of a stock of goods. Certainly such a transaction could be considered voidable as a fraudulent conveyance. Here, however, as the Court concludes,

"Now, the only change in the debtor's attitude towards his creditors, worked by this transaction, is that * * * while before he was, it may be, doing nothing, he is now, it may be, in the way of making something for his creditors. To say that such change in the attitude of the debtor, to the obvious benefit of the creditors, was actuated by a purpose on his part to hinder, delay, and defraud them, is absurd." 109 Ala. 286, 19 So. 401, 402.

■■ So it is in our case. We have a "creditor to be defrauded." We have "a conveyance of property out of which the creditor could have realized his claim." But the District Court was right in concluding that there was no evidence of "a debtor intending to defraud." As to this issue there was "no genuine issue as to any material fact." F.R.Civ.P. 56(c), 28 U.S.C.A.

And it might be noted that if this was an attempt to hide a loan behind the language of a sale, none would be deceived. As the Trustee himself so ably points out, and as we have held, such language has been universally construed to have the effect of a security device. And this conclusion of its legal effect is based upon the terms of the contract revealed on its face, and not, as is usual, by extraneous facts showing it to be something other than what it says.

■ And, as discussed earlier, to the extent that such a transaction might have been found constructively fraudulent under these prior Alabama statutes and decisions merely because of the form of the transaction, in the absence of actual fraud the ARA has supplanted their effect. Applied in the light of the business purpose of this statute, there is nothing to indicate an intention that the "transfer, sale, pledge or mortgage" must be disjunctive. It may technically be one or more of such things. The important thing is that, as is so plainly the case here, if it is to serve as the means of acquiring needed financing Alabama validates the transaction provided the terms of ARA are satisfied.

■ The Trustee has further urged that this was fraudulent because Bankrupt has retained a 15% interest in the "purchase price" of the accounts since the contract binds CCC to pay this percentage when the full amount of the accounts was collected. We do not agree. We find no purpose here to put this amount beyond the reach of general creditors. It did not serve to give Bankrupt a secret interest. CCC was obligated under the contract to pay it to Bankrupt immediately upon its collection. Having done so this amount would, of course, pass out of any possible control or claim of CCC and inure to the benefit of general creditors of Bankrupt. Of course until collected the creditors lost nothing. Upon collection they immediately obtained the same rights as though the contract purported only to transfer to CCC an 85% interest.

Thus, must we conclude that the Trustee fails as to claims based upon theories of fraudulent transactions between CCC and Bankrupt.

### IV.

### Pre-Bankruptcy Assignments— Pre-Bankruptcy Collections.

With great elaboration in his pleaded fifteenth claim [9] and perhaps in part in

---

9. The fifteenth claim covered accounts receivable assigned from May 19, 1949, to December 31, 1952, and claimed to have been in the neighborhood of $3,000,000.

the sixteenth claim [10] the Trustee sought recovery for the amount of accounts receivable assigned during the several years prior to bankruptcy and in all cases collected from the account debtors by assignee more than four months prior to bankruptcy. The basis was essentially the twofold one set forth and discussed under III(A) and (B)—failure to comply with ARA and, as to the sixteenth claim, the attempted assignments were in fraud of creditors.

This was also an area in which the District Court, for reasons we now fully appreciate, became confused. In his initial opinion he assumed that these claims (and others) "had been relinquished." This was corrected by a subsequent order which reflected that in part, at least, these were the claims on which the Court had previously granted CCC's motion for summary judgment on the Trustee's "15th claim and on so much of the 16th claim and other claims that purport to encompass assigned claims which were paid in full more than four months prior to bankruptcy * * *."

### (A) Invalid for Failure to Comply with ARA.

This differs in three principal respects from the problem dealt with in III(A). First, the accounts receivable were collected by CCC more than four months prior to bankruptcy and not after bank-

ruptcy. Second, the noncompliance in the fifteenth claim with ARA was for reasons other than failure to specify properly assignee's principal place of business. And third, the Court's action was not after trial, but by summary judgment.

As to the second difference, CCC's brief candidly states that "There has been no trial on the merits as to whether or not there was compliance with the" ARA. No contention has yet been made that these alleged defects did not amount to noncompliance. Summary judgment was sought and granted on the sole ground that since the accounts involved were all collected by CCC long prior to bankruptcy (and at least more than four months), the Trustee could not recover.

The Court, without opinion, presumably based this action on Costello v. Bank of America National Trust & Savings Ass'n, 9 Cir., 1957, 246 F.2d 807. That Court, after first determining that the assignment of the state highway construction contract was not within the California Accounts Receivable Act, West's Ann.Civ.Code, § 3017 et seq., proceeded to state an alternative ground for its conclusion that the assignee, not the trustee, should prevail. In doing so, it affirmed the Trial Court—whose action was described as contrary to that of another California District Court whose de-

Noncompliance with ARA was alleged to have occurred from its effective date, October 8, 1949, down through October 5, 1951, for the failure to file any notice of assignment, and for the period October 5, 1951 to December 31, 1952, for failure of Commercial Credit Company, Inc., of Maryland (the assignee named in the filed notice) to obtain the written assignment required by ARA. For this claim a distinction between Commercial Credit Corporation and Commercial Credit Company, Inc. of Maryland is asserted to have special significance, see note 2, supra. The Trustee asserted that the assignments were ineffective against Trustee under Section 70 (c) and (e), and alternatively the defective assignments created in CCC only an equitable lien which pursuant to Section 60 was not deemed perfected until immediately preceding bankrupt-

cy at which time CCC knew bankrupt was insolvent.

10. The sixteenth claim covered assignments of accounts receivable made during the months of January through July 1953 of a face amount asserted to have been in the neighborhood of $500,000. The ARA noncompliance was the failure to specify Montgomery as the principal place of business, the ruling on which was, of course, correct for the reasons set forth in III(A), supra, without regard to whether the accounts were collected prior or subsequent to bankruptcy. The alternative Section 60 claim fell thereby as well. The assignments were alleged to have been in fraud of creditors under Sections 1 and 7, Title 20, Code of Alabama 1940, for the reasons specified in III(B).

cision, Menick v. Carson, D.C.S.D.Cal. 1951, 96 F.Supp. 817, is here so much pressed by Trustee.

In Menick v. Carson, the District Court, rejecting the extreme claims of the trustee that all creditors were protected as well as the extreme position of assignee that no creditor was protected, set up a middle of the road formula. It held that as to creditors existing as of the date of assignment and as to those who became creditors between that time and the date the assignee collected the account, the assignment was not protected. Under Section 70(e) the trustee could assert their rights. However, as to creditors who became such after collection, there was nothing to set aside.

The 9th Circuit in the Costello case, however, rejected even this moderate view by language which is either dicta or decisive depending on one's point of view, at 246 F.2d 813:

> "There is nothing in the language of the statute or its legislative history which compels us to stretch the recording statute to encompass collected obligations as well as outstanding accounts. The statute is concerned expressly only with the assigned right or rights. It is silent in respect to the *proceeds* inuring under that right." (Emphasis in original.)

Persuasive as this is, we cannot at this stage say that as a matter of law no claim was made out for non-compliance with ARA simply because accounts were collected. There is, of course, no magic in the four months' period, for if the assignments were vulnerable under Section 70 the time is controlled by local law. As Collier has succinctly put it,

> "Section 70e(1) prescribes no conditions or time limits within which transactions are deemed voidable. It merely incorporates the applicable state or federal law in this regard. Consequently, the four months' or one year's limitations established in §§ 60 and 67 are inapplicable in a suit under § 70e." 4 Collier, Bankruptcy § 70.71 at 1355 (14th ed. 1956).

We must bear in mind that it is the Alabama law which we must here interpret and apply. Despite their common origin as a reflex against adverse judicial decision, many of these acts differ in their subsidiary significant details. Ribaudo v. Citizens National Bank, 5 Cir., 1958, 261 F.2d 929. So here, the Alabama Act (ARA) is different from the California Statute. The 9th Circuit correctly pointed out that the California Act was "silent in respect to the proceeds." 246 F.2d at page 813. But this is not so in ARA.

The ARA expressly refers to proceeds, so much so that the term is carefully defined.[11] And then the Act by both a negative [12] and an affirmative [13] statement sets forth standards. It provides that

---

11. "§ 207. Definitions.—For the purposes of this chapter the following words, unless the context or subject matter otherwise requires, shall have the following meanings:
 * * *
 " 'Proceeds in any form' of an account means any interest in, or benefit accruing from, the account, including: (a) A judgment arising from the account, (b) proceeds of any partial or complete payment of the account in money or otherwise, including any obligation taken as absolute or conditional payment of the account, (c) security subsequently taken for the account, and (d) goods the sale of which gave rise to the account, re-turned or not received by the account debtor."

12. Section 208, after first stating that the assignment is valid and fully perfected without regard to actual notice to the account debtor if the assignment is in writing and notice is filed, then provides:
 "No existing or future creditor of the assignor, and no subsequent assignee of an account receivable, can or shall, after the making of such an assignment in accordance with the foregoing provisions of this section, and during the effective period of any statement, renewal state-

creditors or subsequent assignees have no claim against the assigned account or proceeds if ARA is complied with. The converse, however, is equally plain, that if ARA is not complied with as to an assignment an "existing or future creditor" without notice of the assignment has the prior claim since the purported assignment "shall be inoperative."

 The ARA reflects a purpose by Alabama to consider not only the assigned account but, under some circumstances, the proceeds as well. Just what those circumstances are or will be, we do not know. Nor do we think that at this stage we should undertake to ferret out those possibilities or set them forth if ascertained. Much of it might well turn out to be of mere academic importance, for the trial on this issue may finally establish that there is no creditor whose rights the Trustee can successfully assert. As it now stands, the allegations of the complaint are sufficiently definite to set forth that there were as to all such assignments creditors in these possible classes: (1) existing at the time of the assignment, (2) subsequent to assignment but prior to collection, (3) subsequent to collection, and (4) those in categories (1), (2) or (3) who remain creditors as of the date of bankruptcy. Certainly as to one of these creditors, the assignment would be ineffective if ARA were violated.

We think on such a matter of serious importance to the business interests of Alabama, exposition of the law ought to be made in the light of the actual facts. Any other course would expose us to the likelihood that we would engage in pure dicta.

Not the least of the uncertainty arises from the nature of the noncompliance with ARA. If it was merely in the recording, i.e., sufficiency or manner of filing of the notice of assignment, the collection by the assignee might, under Alabama law, be significantly analogous to a mortgagee coming into possession, (or foreclosing) of property under a mortgage or chattel mortgage. See 4 Collier, Bankruptcy §§ 70.55 at 1288; 70.56 at 1292, n. 18; 70.57 at 1297, n. 27; 70.64 at 1323, n. 22; 70.79 at 1406, n. 9; 70.-81 at 1417, n. 23 (14th ed. 1956). It might be much different if, as the pleadings suggest, some of the assignments named as assignee a party other than CCC who advanced the funds.

Added to this is the uncertainty inherent in the application of Section 70 of the Bankruptcy Act. How far back, for example, does Alabama go in considering proceeds (collections of an assigned account) still to be property of the bankrupt under Section 70, sub. a(5)? What class of creditor can attack the transfer and is there any such actual creditor as of the date of bankruptcy as Section 70, sub. e requires? See 4 Collier, Bankruptcy, § 70.81 at 1417–18 (14th ed. 1956). To what extent is the ideal theoretical lien-holding creditor of the now Sampson-strong arm section 70, sub. c available as an aid to the Trustee? [14]

---

ment, or affidavit of continuance filed by the assignee as provided in section 209 of this chapter, acquire any right, title, lien or interest in or to such account, or any proceeds in any form thereof, equal or superior to or in diminution of the rights of the assignee under such assignment, except as hereinafter specified in the proviso to subsection 3 of section 209."

13. The "proviso to subsection 3 of section 209" referred to, note 12, supra, after stating what acts shall constitute a proper filing, provides:

"Assignments of accounts made after the effective date of this chapter shall be inoperative against creditors and pur-

chasers without notice until the statement prescribed in subsections 1 and 2 of this section (or renewal of notice or affidavit of continuance as provided by this chapter) shall be filed for record in accordance with the provisions of this chapter."

14. Collier states that Section 70 (c) may be of little help, 4 Collier, Bankruptcy § 70.55 at 1286 (14th ed. 1956). We would not wish to predict our ruling now, but the widespread criticism of Constance v. Harvey, 2 Cir., 1954, 215 F.2d 571, and Conti v. Volper, 2 Cir., 1956, 229 F.2d 317, see 4 Collier, supra, Supplement, additions to pp. 1258, citing Marsh, Constance v. Harvey—The

If this is unsatisfactory, it is of CCC's making. It is only that frustration which is so common from disposition of a claim or defense virtually on the basis of pleadings only when appeal proves the bold course to have been erroneous. As CCC urged, the District Court held that no matter how many creditors there still were, the collection of the assigned account by the assignee permanently dissolved all deficiencies. That sweeping position, we hold, is untenable. So, years later must now begin the exploration of the facts to determine whether any such persons exist either in fact or in permissible legal fiction.

### (B) Assignments Invalid as in Fraud of Creditors.

The sixteenth claim, see note 10, supra, is stated in a way that it overlaps in part the months in the year 1953 involved in Claims III(A) and (B). We list it here separately merely to indicate that we have dealt with it.

For the reasons fully discussed under III(B), the action of the District Court was correct in granting summary judgment to CCC without regard to the time of collection, before or after bankruptcy.

### V.

### Voidable Preference Claims.

■■■■ The Trustee has asserted as a further claim that the assignments during 1953 were voidable transfers under Sections 60 and 67, sub. d(2) of the Bankruptcy Act, 11 U.S.C.A. §§ 96, 107, sub. d(2) in that they were within the proscribed time and when the Bankrupt was known to be insolvent.

Normally these issues would still be in the case, as the Court below erroneously ruled that the transaction was a sale rather than a loan. This ruling left nothing to try under Section 60, for in the Section 60 definition of a preference as "a transfer * * * for the benefit of a creditor for or on account of *an antecedent debt * * *"* (emphasis supplied), lies the exclusion of any claim if the prerequisite debt cannot be shown. See 4, Collier, Bankruptcy § 60.19 at 823–24 (14th ed. 1956).

But the Trustee abandoned all claims based on this theory,[15] and there is no reason suggested to extricate him from this knowing act.[16]

### VI.

### Miscellaneous Claims.

The preceding Sections III–V have been an attempt to present in an organized way the primary claims of the Trustee. As is typical, such an approach leaves much that is "miscellaneous." The more significant of these remaining points are discussed here.

### (A) Usury.

■■■■ For example, the Trustee contends that the usury statutes would impose a limitation upon such a transaction. The Alabama law limits rates of interest to 8% on written contracts and 6% on all others. Ala.Code 1940, Tit. 9, § 60. While we do not determine the amount involved under this claim, it

"Strong-Arm Clause" Re-Evaluated, 43 Calif.L.Rev. 65 (1955); 1270, n. 2; 1272; 1274, at least suggest that if Alabama law finally declares that collection cuts off all creditors except, say, (1) existing or (2) subsequent to assignment but prior to collection, we should be certain that reasonable reconstruction of Section 70 (c) justifies a result which might otherwise be extremely artificial.

15. At the end of the trial, on the next to the last page of printed trial transcript, Mr. Sirote, for the Trustee, gave the following summary conclusion relevant to this point.

"Now, let's get this clear. The Court, as I understand it, ruled out certain phases of the claims. *The Court did leave in one phase of the thing; that is which related to the preference,* which related to collections made within the four months period. *That part of it is what we have abandoned.* The preference was a claim based upon the collection of accounts made within the four months period. Any other abandonment on our part is involuntary, and based upon the rulings of the Court. That's right, isn't it?" (Emphasis supplied.)

16. Of course, this does not apply to the special circumstances involved in the claim relative to additional security for antecedent debts, discussed VI(B), infra.

should be noted that it would be relatively small. The Alabama law provides that the penalty for usurious contracts only involves the interest. This is so because only the principal is legally due, and if any interest has been paid it is deducted from the principal in determining the amount due lender. Ala.Code 1940, Tit. 9, Sec. 65. See note 4, supra.

Determinative here, however, is a question relating to a problem of conflicts of law. The parties agreed, and the contract provided, that "this Contract * * * shall be construed and governed by the laws of the State where it is accepted by [CCC]." This was, of course, in Baltimore, Maryland, where the contract was made. In fact CCC advanced money to Bankrupt only upon receipt in Baltimore of schedules of accounts receivables assigned to CCC, and upon receipt of these schedules deposited the advanced funds to Bankrupt's account in the Union Trust Company of Maryland, a Baltimore bank. The contract required Bankrupt to send all checks received from account debtors to CCC's Baltimore office and they did, in fact, do so. Whatever conclusions may be drawn as to the law controlling the contract generally, it cannot be disputed that for purposes of usury the transaction had substantial contact with Maryland.

The proposition is well established in conflicts of law that, as to questions of usurious interests on a loan transaction having contact with many states, the law upholding the contract is to be controlling. This is so because parties are presumed to intend their contracts to be legal. Under Maryland law "no corporation shall interpose the defense of usury in any action." Md.Code 1957, Art. 23, § 125. Accordingly we hold, without passing on the controlling conflicts of law rules for other purposes, that as to the question of usury this contract had adequate contact with the State of Maryland to be upheld by its law. Fahs v. Martin, 5 Cir., 1955, 224 F.2d 387, 397; Lubbock Hotel Co. v. Guaranty Bank & Trust Co., 5 Cir., 1935, 77 F.2d 152, 156; Brierley v. Commercial Credit Co., 3 Cir., 1930, 43 F.2d 730, certiorari denied 282 U.S. 897, 51 S.Ct. 182, 75 L.Ed. 790; 2 Beale, Conflict of Laws 1241 (1935) (citing four columns of cases); Stumberg, Conflict of Laws, 237–40 (2d ed. 1951).

(B) Post-Bankruptcy Assignments.

The record shows without contradiction that after bankruptcy and on July 31, 1953, CCC came into possession of accounts receivable in the amount of $2,-562.71. No advances of cash to Bankrupt were simultaneously made by CCC as was typically the case of assignments, such as those considered in Part I, supra. Consequently, the "transfer" was for an antecedent debt.

CCC undertakes to justify this by the contention that under the contract [17] it had the right to obtain and retain additional security. Of course, the Bankrupt (then a debtor under its Chapter XI Petition) could not legally transfer accounts receivable or cash in such a fashion to afford CCC a preference over other creditors. The right of CCC to retain the benefit of these must then be tested as though CCC had moved for an order to compel the Trustee to surrender the items.

Any such effort would have been based on the claim that the contract obligated the Bankrupt to transfer additional security as might be needed from time to time. The contract certainly did not express this. It did obligate CCC to purchase acceptable accounts receivable as tendered by Bankrupt and bound Bankrupt to tender them first to CCC. But for such "purchases" CCC was to pay the 85% of the face amount.

17. "(1) Commercial Credit [CCC] may hold for purchase or as security any Accounts, property, securities, or moneys of Customer [Bankrupt], which may at any time be assigned to or delivered to or come into the possession of [CCC], and may apply the same or the proceeds thereof to the payment of any amounts which at any time then or thereafter are or might be owing to [CCC] by customer [Bankrupt] either under this contract or otherwise; * * *."

There was no enforceable contract right to these accounts and the purported post-bankruptcy transfer was invalid [18] against the Trustee. § 70(d) (5), 11 U.S.C.A. § 110(d) (5).

### (C) Accounts Assigned As Additional Security.

■ Somewhat related to the post-bankruptcy assignments, VI(B), supra, are accounts assigned as additional security to CCC on the eve of bankruptcy. In the latter part of July 1953 CCC held $7,829.74 in accounts on which they had advanced $6,655.28 which were running 60 days past due. In such a situation it was CCC's practice, pursuant to the contract, to require the assignor to repurchase such accounts. Apparently it was impossible for Bankrupt to do so, so they merely "substituted" for these delinquent accounts (totaling $7,829.74) two additional schedules totaling $5,978.94. This was accomplished by assignment on July 29, 1953 of $3,416.23 which was covered in Trustee's claim No. 2, and the assignment of July 31 of $2,562.71 covered in Trustee's claim No. 3 just discussed under Part VI(B). The Trustee's claim No. 2, so far as we can determine, was never waived and if it were it was only so insofar as it was included in the claim for $109,897.97. Consequently, it was and is in the case. CCC never made the 85% advance against these assignments of $3,416.23. Consequently, the "transfer" was for an antecedent debt.

Thus there was directly presented the serious question of whether this was a voidable preference. See 3 Collier, Bankruptcy § 60.48 (14th ed. 1956). In the Trustee's complaint the second claim was based primarily on § 67 d(2) (a) (b) (c) (d) of the Bankruptcy Act, 11 U.S.C.A. § 107 d(2) (a–d). But, as this claim was so unlike that respecting the accounts receivable aggregating $125,125.57, we think the complaint comprehended the theories based on Section 67 d(2) (a) through (d) and, upon this evidence received without objection, an implied amendment asserting the theory of a Section 60(a) preference. In the confusion we think that the Court erroneously assumed that this claim was abandoned and presented nothing for decision. In that light our review is limited to the determination that the District Court has not yet decided the issue. It is premature for us to declare that had the Court rejected it, there was proper basis for that action.

### (D) Accounts Collected Subsequent to Adjudication.

■ Trustee's claim No. 4 was for the payments received by CCC on May 26, 1954 and June 25, 1954 aggregating $586.18 on the account of Harris Pump Supply Company.

Trustee's claim No. 5 grows out of the indebtedness owed by Valley Plumbing & Heating Company to Bankrupt in the sum of $2,653.04. While the matter has the usual obscurity of this record, presumably the account debtor gave Bankrupt promissory notes in payment of this account. CCC collected $990.37 of this amount (presumably payments on the notes) subsequent to the adjudication of bankruptcy April 12, 1954. The balance of the notes, $1,652.67, has not yet been paid.

These claims were not formally passed on by the Court one way or another. We think they are in the case for if they were "waived," it was so only insofar as they were items included within the claim for $109,897.97.

While it is premature to express a view, we think it not inappropriate to make comments which will perhaps facilitate the orderly disposition of these two small matters. The Trustee seems to labor under the conviction that since these collections were made by CCC subsequent to the adjudication in bankruptcy (April 12, 1954), they have some standing different from the collections made either by the receiver or by CCC in

---

18. This amount was specified as claim 3 which was "waived" because it was included in the large claim for $109,897.97. It was and is still in the case and CCC must afford the Trustee the full benefit of it.

the interim between the filing of the petition July 30, 1953 and the date of adjudication. We regard that as immaterial. Presumably the assignments of the accounts receivable were effected prior to bankruptcy and the validity of the transfer as of that time determines the right of CCC to retain the collections whenever made. So far as we can determine the accounts represented by these two claims are no different than the other pre-bankruptcy assignments. If that is so, the same principles will apply as outlined in the detailed discussion concerning the large claim, see III, supra. If they are post-bankruptcy assignments, then they will be covered by the principles discussed in Part VI(B).

■■■ Claim 5 offers an additional complication. Apparently there are some promissory notes involved. Whether these took the place of the accounts receivable from the account debtor, whether they were meant as payment of that account, or whether they were merely security for the payment of it is not disclosed by this record. To the extent that the promissory notes were a payment of the accounts receivable, the rights of the parties will be determined by Alabama law other than that reflected in the ARA. Section 207 expressly "excludes sums due on and rights represented by judgments, notes, bills of exchange, drafts, acceptances, or other negotiable or nonnegotiable instruments or agreements for the payment of money * * *."

### (E) Attorneys' Fees and Contract Charges.

■■■ The Trustee further complains of the allowance of attorneys' fees to CCC. The contract between Bankrupt and CCC provided for attorneys' fees.[19] We find that counsel for Trustee effectually agreed as to the reasonableness of the fee.[20]

The contract not only provided for an assessment of attorneys' fees, but for contract charges as well. See III(B), Relationship Between the Parties, supra. These charges we treat as vicarious interest so long as the balance of advances remains outstanding. They are recoverable to the extent of the security. Oppenheimer v. Oldham, 5 Cir., 1949, 178 F.2d 386. That the $108,321.42 was temporarily in the custody of the Receiver under an improvident order did not make CCC any less entitled to its rightful enjoyment and control of its funds.

### VII.

### Judgment.

Thus have we reached the end, and the result that the case is affirmed in part and as to the other phases is reversed and remanded for further and not inconsistent proceedings.

Affirmed in part, reversed and remanded in part.

19. "If [Bankrupt] fails to perform promptly or breaches any of the promises or obligations herein contained, then [CCC] shall be entitled to recover from [Bankrupt], and [Bankrupt] shall pay [CCC] all attorneys' fees, court costs, and all other expenses which may be expended or incurred by [CCC] to obtain or enforce payment of any Account, either against the [account] debtor, [Bankrupt] or any guarantors, or expended or incurred in the prosecution of any action against [Bankrupt] or any guarantors, or concerning any matter growing out of or connected with subject matter of this Contract and Accounts purchased hereunder; * * *."

20. "Mr. Sirote [counsel for Trustee]: I don't question that they paid you the fee that is indicated there, if that is what you mean.

"Mr. Perrine [counsel for CCC]: Do you question the reasonableness of the fee?

"Mr. Sirote: I am questioning whether we are chargeable with it.

"Mr. Perrine: But there is no question about the reasonableness of the fee? It is not a question of whether you are chargeable but the reasonableness of the fee?

"The Court: Don't get off into something not material.

"Mr. Sirote: I am not questioning that either."