The **CORAL GABLES FIRST NATION- AL BANK** and Pan American Bank of Miami, Appellants,

v.

**CONSTRUCTORS OF FLORIDA, INC.** et al., Appellees.

No. 19084.

United States Court of Appeals
Fifth Circuit.

Feb. 26, 1962.

William B. Roman, W. G. Ward, Miami, Fla., Leo L. Foster, Tallahassee, Fla., for appellants, Ward & Ward, Miami, Fla., of counsel.

Fuller Warren, Miami, Fla., Egbert Beall, Grover C. Herring, West Palm Beach, Fla., John H. Gunn, W. L. Gray, Jr., Miami, Fla., Tom Maxey, Coral Gables, Fla., for appellees, Blackwell, Walker & Gray, Miami, Fla., of counsel.

Before JONES, BROWN and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Although nearly drowned by words in the briefs, reply briefs, motions to dis-

miss, rejoinders and the like exceeding in length a comparatively small printed record of 237 pages, this case presents a simple question: did the Bankruptcy Court in a Chapter X reorganization proceeding have the power to permit in the State Court the continuance of litigation having a direct interest to the Debtor's estate? As it comes to us this question is raised by the specific complaint that the Bankruptcy Court erred in refusing to enjoin enforcement of, and execution on, such State Court judgment.

The Debtor is Constructors of Florida, Inc. The story is long and starts in 1957. The Banks[1] had made three loans to Constructors secured by separate mortgages. Alleging that one of the notes was in default, the Banks filed foreclosure proceedings in the Florida State Court in January 1957. That proceeding soon became a complicated one. The part we are concerned with is the counterclaim by Constructors against the Bank for usury and related penalties. That involved also related questions whether the Banks were entitled to satisfy any judgments for usury penalties by offsets against the indebtedness and whether because of usurious conduct and the clean hands doctrine the Banks had in effect forfeited the security of the mortgage. The latter aspect posed a controversy between the Banks and the Surety[2] on the major municipal contract of Constructors. These disputes are what the parties refer to as the "first phase" of the Bank litigation. Many more complicated claims and counterclaims were presented in the "second phase," but we need not be concerned with them.

At this stage enters the United States District Court. An involuntary petition in bankruptcy was filed against Constructors in October 1957. Shortly thereafter the Bankruptcy Court appointed a Re-ceiver and by suitable orders the Receiver was authorized to continue the Florida State Court litigation. There was no objection in the bankruptcy proceedings to that order at that time. Nor is it now contended that at that time such order was either improvident or beyond the Court's power. The Receiver and his counsel appeared and actively participated in the State Court proceeding.

In June 1958 a judgment was rendered by the Florida State Court casting the Banks for substantial usury penalties, denying enforcement to the Banks' mortgages because of the clean hands doctrine and giving priority to the Surety as between the Banks and the Surety. Some other relief to other claimants and counterclaimants was denied. Appeals were taken, apparently by all parties, from that judgment to the Florida Court of Appeals.

In the meantime, without there ever having been an adjudication of bankruptcy, a Petition for Reorganization under Chapter X[3] was filed in November 1958. The same person who had previously served as Receiver in the bankruptcy proceeding was shortly appointed as Trustee in the Reorganization Proceeding. An order was entered by the Bankruptcy Court in that proceeding authorizing the Trustee to continue the State Court litigation.

In December 1958 a proposed Plan of Reorganization was filed. This Plan contained detailed, express provisions concerning the continuation, outcome and effect of the State Court litigation.

In February 1959 the Bankruptcy Court entered an order authorizing the Trustee to continue the State Court litigation. It bears emphasis that this approval expressly provided that no execution should issue on any such State Court judgment or orders without fur-

---

1. These are The Coral Gables First National Bank which was the named lending institution and The Pan American Bank of Miami, a Florida state bank, which was a major participant in the loans under Federal Reserve Regulations, and was a plaintiff and cross-defendant in the State Court proceedings.

2. American Surety Company of New York.

3. 11 U.S.C.A. § 526.

ther order of the Bankruptcy Court.[4] The Banks[5] after some intervening orders, were recognized as having certain tentative voting rights on the Plan. The Banks along with all other creditors approved the proposed Plan and in March 1959 the Plan was approved. As later pointed out in detail, this Plan made elaborate provision for the continuation and prosecution of the State Court proceedings and the effect of judgments to be rendered in it.

Shortly thereafter and on March 22, 1960, the Florida State Court of Appeals rendered its decision which affirmed the judgment in part but reversed it and modified it in other substantial particulars.[6] The Banks, unsatisfied with this decision of the Florida Court of Appeals, unsuccessfully pursued further review in the Supreme Court of Florida[7] and in the United States Supreme Court.[8]

After all of these appeals were fruitless, the mandate was received back in the Florida State Trial Court by early April 1961. It was at this point and at this place that the Banks for the first time ever made (or now make) an objection that the Florida State Courts were without jurisdiction to proceed to enter a judgment pursuant to the mandate, and the Bankruptcy Court was without jurisdiction to permit the continuation of State Court proceedings. This plea was overruled in the State Court.[9] With the jurisdictional objection overruled, the State Trial Court proceeded to enter a final judgment as to "the first phase," the broad effect of which was to hold the Banks liable for a substantial sum for usury penalties, deny enforcement of the Banks' security, and presumably subordinate the Banks as creditors to the position of the Surety.

Unsuccessful in the State Courts, the Banks now turned to the Bankruptcy Court. On April 10, 1961 the Banks sought an injunction prohibiting further State Court proceedings and any enforcement of, or execution on, the State Court judgment. After a hearing the Bankruptcy Court denied this broad prayer for injunction and modified its prior order of February 1959 (see note 4, supra) to permit execution on the judgment but only insofar as the Trustee in the Reorganization Proceeding was concerned. Execution for this limited purpose being permitted by the Bankruptcy Court, the State Court judgment was enforced

---

4. No objection was then made by the Banks as to that order, nor is any contention now made that at that time such order was unauthorized or improvident.

5. Actually only The Coral Gables First National Bank was a named party in the bankruptcy or Reorganization Proceedings. The Pan American Bank of Miami had never filed a claim of any kind or otherwise made any appearance. Consequently, the State Bank did not itself vote to approve the Plan. The National Bank's approval of the Plan is referred to as being that of "the Banks" since claims filed by it covered the entire alleged indebtedness of the Debtor to both, as well as the right of both to liens against the Debtor's property. As joint participants in the loan and security, the Plan of Reorganization expressly provided for benefits to both under various contingencies. Pan American does not, and cannot, now assert that Coral Gables' approval is ineffectual as to it.

6. Coral Gables First Nat. Bank v. Constructors of Fla., Third Dist.Ct. of Appeals of Fla., 1960, 119 So.2d 741.

Attorney fees adjudged against the Banks were reversed. Also reversed was the forfeiture of a certain amount of principal against the National Bank which it provided without participation by the State Bank. This was on the basis that the National Banking Act provides the only usury penalties that may be imposed against a National Bank. See 12 U.S.C.A. §§ 85, 86. Otherwise the decree was affirmed and remanded for necessary adjustments and computations.

7. Coral Gables First Nat. Bank v. Constructors of Fla., Fla.Sup.Ct., 1960, 123 So.2d 349.

8. Certiorari denied February 1961, 365 U.S. 811, 81 S.Ct. 690, 5 L.Ed.2d 691.

9. On April 17, 1961, and just prior to the instant appeal taken on May 1, 1961, to our Court, the Banks commenced an interlocutory appeal to the Florida Court of Appeals challenging this action. This was denied May 25, 1961, 132 So.2d 806, cert. den. 1962. 82 S.Ct. 687, cert. den. by Fla.Sup.Ct., 133 So.2d 319.

against the Banks on April 18, 1961. Pursuant to that execution, large sums were paid over by the Banks to the Trustee who now holds them subject to further orders of the Bankruptcy Court.[10] This was followed shortly on May 1, 1961, by the Banks' appeal to this Court.

At the time the Banks, in April 1961, contended for the first time in the Bankruptcy Court that the State Court proceedings were beyond the power of that Court or the power of the Bankruptcy Court to permit, the relief sought was not modest in nature. In effect the Banks contended that at least beginning with the time the Florida Court of Appeals modified the judgment in March 1960, the Bankruptcy Court had no power to permit in the State Courts the further continuation of litigation having direct bearing on the reorganization estate.[11] That being so, the argument then went on, the whole question of usury penalties has to be retried from beginning to end. In short, all of this effort for the past 4½ years is for nought.

■■ To sugar-coat this bitter pill, the Banks insist that the Florida Courts committed critical and substantial errors in the application of the National Banking Act as to usury penalties.[12] But this is unavailing since it must be recognized that State Courts are competent to adjudicate cases arising under, or affected by, that Federal law. The fact—asserted by the Banks—that the Florida Courts erred would not give a Federal District Court any power to "correct" that error by a review or, worse, a prohibitory injunction. See 28 U.S.C.A. § 2283. If the Bankruptcy Court had the power to permit the Florida Court to continue, and if the Florida Court had the power to continue that litigation, then that power included the power to err. And, so long as any such action by the Florida State Court did not encroach upon the exclusive jurisdiction of the Bankruptcy Court or otherwise on an exclusive Federal domain, correction of any error—the occurrence of which we do not begin to imply—would have to come through regular processes of the Florida system.

■■ One circumstance which we regard as of tremendous significance, but which the Banks brush aside with no supportable reasons, is that a Plan of Reorganization was proposed and adopted. 11 U.S.C.A. §§ 526–549. The Banks, as secured and unsecured creditors, approved the Plan. The Plan made express and detailed reference to the State Court Bank litigation. It referred to this litigation in the accepted terminology of "the first phase" and "the second phase." On its face the Plan reflects that one of the substantial sources of funds out of which to pay creditors (secured and unsecured) was the hoped-for recoveries against the Banks. These claims were, of course, those for usury penalties.[13] The Plan also expressly provided that " * * * the validity and the relative priority of the conflicting claims of lien of Banks and Surety will be dependent upon the outcome of Bank Litigation." Also contemplated, or at least hoped for, was a cancellation of all or a part of the indebtedness to the Banks on the initial loans and promissory notes from the operation of the Florida usury penalties.[14] And these provisions concerning the

---

10. These amounts (including interest and sheriff's fees) were: Coral Gables First National Bank $87,864.71; Pan American Bank of Miami $312,092.78.

11. While the time is now pinpointed as March 1960, the contention itself was not made until early April 1961 in the State Court and on April 10, 1961 in the Bankruptcy Court.

12. This complaint was pressed elsewhere simultaneously. See footnote 9, supra.

13. Also included were claims for damages for unwarranted withdrawal of loans and credit by the Banks. These were not allowed.

14. This anticipation was reflected by a precise and carefully designed provision as to the payment of Federal income taxes on the "income" vicariously received by the Debtor through this cancellation of its debts. See, e. g., 2 Merten, Law of Federal Income Taxation, § 11.23, Plan of Reorganization, Art. XIX, par. I.

"first phase" and the "second phase" [15] were a significant part of the overall plan by which new capital in excess of $200,-000 was brought into the Debtor corporation.

This Plan of Reorganization, approved by the Banks and thereafter approved by the Bankruptcy Court, was of great significance. We reject the Banks' contrary contention. We hold specifically that the Plan of Reorganization made purposeful provision for the continuation and exhaustion in the State Courts of the "first phase" of the Bank litigation, and that the claims and cross claims between the Debtor and the Banks were to be determined in those proceedings.[16]

These facts all combine to make it perfectly clear that the Bankruptcy Court in the Reorganization proceedings had the power—and properly exercised it within its considered discretion—to continue this much of the State Court litigation. The authorities abundantly sustain the existence of this power [17] and nothing in the cases [18] so vigorously pressed by the Banks opposed either the existence of the power or its proper use under the circumstances of this record. The Creditors of the Debtor and the Trustee had a substantial reason for believing that the Debtor had valuable claims against the Banks which would materially aid the Debtor either through the receipt of cash or reduction of indebtedness, or both, and perhaps in the release of securities for the benefit of other creditors or classes of them. The State Court was certainly a suitable forum in which to obtain a judicial determination of these claims as between the Debtor and the Banks.

■ In spite of the complexities brought out in the briefs and arguments, the question before us remains the basic one of whether the District Court had the power to permit the litigation to continue in the State Courts with adequate control reserved as to the ultimate disposition of its fruits. The record before us leaves little doubt that the Bankruptcy Court had the power and the exercise of that power was well within its discretion —and especially so when the Banks instituted the State Court litigation, expressly approved and consented to its continuation, took the position for the first time in 1961 that the State Courts had lost their power a year earlier to determine the issues, and on the eve of the hearing in this Court were still seeking a reversal of the "erroneous" decision by the State Court. At the same time we do not consider that, as urged by appellees, we should treat this as a frivolous appeal and award damages under our Rules against the Banks.

Affirmed.

15. Nothing we say or do in this decision is to be understood as an expression one way or the other on "the second phase" either as to the intrinsic merits, whether it should, or must be, further determined in the Bankruptcy Court or the extent to which it may, must, or should, be further disposed of in the State Court.

16. As in note 15, supra, we likewise expressly disavow any purpose here to indicate any view on the extent to which, if any, the State Court judgment is to determine priorities, enforcement of security by the Banks, or other creditors, or the like. Although the Bankruptcy Court refused to enjoin execution on the State Court judgment, the funds received by the Receiver are now, and will remain, subject to the sole control and disposition of the Bankruptcy Court.

17. See § 11 of Bankruptcy Act, 11 U.S. C.A. § 29, made applicable to Chapter X by § 102 of the Act, 11 U.S.C.A. § 502. See also § 116 of the Act, 11 U.S.C.A. §

516. Foust v. Munson Steamship Lines, 1936, 299 U.S. 77, 57 S.Ct. 90, 81 L. Ed. 49. See also 6 Collier, Bankruptcy § 308 at 606.

18. State of Texas v. Donoghue, 1937, 302 U.S. 284, 58 S.Ct. 192, 82 L.Ed. 264, reversing State of Texas v. Donoghue, 5 Cir., 1937, 88 F.2d 48, discussed in 6 Collier, Bankruptcy at 605; Brown v. Gerdes, 1944, 321 U.S. 178, 64 S.Ct. 487, 88 L.Ed. 659; Thompson v. Magnolia Petroleum Co., 1940, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876; Coleman v. Alcock, 5 Cir., 1959, 272 F.2d 618; Blackford v. Commercial Credit Corp., 5 Cir., 1959, 263 F.2d 97; Reconstruction Finance Corp. v. Kaplan, 1 Cir., 1950, 185 F.2d 791; In re Cuyahoga Finance Co., 6 Cir., 1943, 136 F.2d 18; Warder v. Brady, 4 Cir., 1940, 115 F.2d 89. The Banks assert that First Nat. Bank of Houston, Texas v. Lake, 4 Cir., 1952, 199 F.2d 524 will " * * * conclude al of the issues involved * * *."